# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MAKINA VE KIMYA ENDUSTRISI, | CASE NO. 3:20-cv-00072 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| KUTLAY KAYA, *et al.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

   This case is before the Court on Defendants' motion to dismiss Plaintiff's complaint, and Plaintiff's motion to dismiss Defendants' counterclaims. Dkts. 131, 141.[1]

   Plaintiff Makina ve Kimya Endustrisi A.S., a Turkish company that manufactures firearms, has filed suit against Defendants Kutlay Kaya, Zenith Quest Corporation, Zenith Quest International, Inc., and Zenith Firearms, Inc., Virginia entities with which it had a contractual relationship. Plaintiff contends that Defendants fraudulently and wrongfully used Plaintiff's name and mark, willfully infringed Plaintiff's trademark, breached contractual provisions requiring that Defendants establish, maintain, and enlarge Plaintiff's business in the United States, engaged in false advertisement, breached their obligations to pay their debts owed to Plaintiff for its shipment and delivery of military products, and defamed Plaintiff. Defendants have brought counterclaims against Plaintiff, asserting breach of contract claims arising from the parties' 2019, 2017, and 2013 contracts, and an unjust enrichment claim.

---

[1] The Court gave Defendants leave to file an amended answer, Dkt. 191, which the Court considers for its additional statute of limitations defense, Dkt. 209.

The Court will deny Defendants' motion to dismiss Plaintiff's breach of contract claims for the 2013 and 2017 agreements because Plaintiff has alleged sufficient facts supporting the elements of a breach of contract claim for each. The Court will also deny Defendants' motion to dismiss Plaintiff's cancellation claims, finding that Plaintiff has standing.

The Court will deny Plaintiff's motion to dismiss Defendants' counterclaims regarding breaching the 2019, 2017, and 2013 contracts, as Plaintiff has alleged sufficient facts to state plausible breach of contract claims. Defendants' unjust enrichment claim will also survive.

## II. Facts

The following facts are alleged in Plaintiff's Second Amended Complaint and Defendants' Second Amended Counterclaims and assumed true for purposes of resolving these motions. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

Plaintiff Makina ve Kimya Endustrisi A.S. ("MKE") asserts claims against Defendants Kutlay Kaya ("Kaya"), Zenith Quest Corporation ("ZQC"), Zenith Quest International, Inc. ("ZQI"), and Zenith Firearms, Inc. ("ZFI") (collectively "Zenith"). Plaintiff is a Turkish company formed under the laws of Turkey, with its principal place of business in Turkey. Dkt. 123 ¶ 6. Plaintiff is Turkey's leading military products provider. *Id.* ¶ 22. Plaintiff has, since 1950, transacted business using the MKE name and trademark. *Id.* ¶ 23. Plaintiff manufactures and exports military products to more than forty countries worldwide, including the U.S. *Id.* ¶ 24. Since 1974, Plaintiff's military products using and displaying the MKE name and MKE trademark have been advertised, promoted, and otherwise sold in commerce throughout the U.S., including in this district. *Id.* ¶ 26. Plaintiff registered its trademark, which incorporates the letters "MKE" in a blue and yellow circular logo (the "MKE Mark"), in Turkey in around 1980. *Id.* ¶¶

27–28. Plaintiff asserts that this Mark has no meaning outside of its use by Plaintiff in the course of its business operations and advertising. *Id.* ¶ 32.

Defendant Kaya formed Zenith Quest International as a limited liability company organized under the laws of Virginia in 2010, and by 2014 it became Zenith Quest International, Inc. *Id.* ¶ 9. ZQI, ZFI and ZQC are corporations organized under Virginia law that have their principal place of business in Virginia. *Id.* ¶¶ 12, 14, 19. Kaya is Chief Executive Officer of Zenith and resides in Virginia. *Id.* ¶¶ 11, 13, 15. Plaintiff asserts that ZFI and ZQI are merely agents of ZQC, and ZQC holds itself out as doing business as ZFI and ZQC. *Id.* ¶ 17.

Plaintiff asserts that it maintains a common law right in the MKE Mark in the U.S. *Id.* ¶ 31. And Plaintiff contends that it maintained those common law rights prior to entering its relationship with Defendants. *Id.* ¶ 31.

In 1984, Plaintiff left the U.S. gun and ammunition market "to avoid the execution of an $847,000 judgment ('Ohntrup Judgment') against it for injuries caused by one of its defective firearms." Dkt. 132 ¶ 15. By 2012, the value of this judgment exceeded $30 million. *Id.* Plaintiff "contracted with ZQI for ZQI to resolve the Ohntrup Judgment debt on [Plaintiff]'s behalf . . . The parties contemplated that ZQI would be the exclusive importer of [Plaintiff]'s ammunition into the U.S." *Id.* ¶ 18.

Plaintiff entered into a commercial agency agreement with Zenith on October 10, 2013. Dkt. 123 ¶ 45. Under this agreement, Zenith became Plaintiff's exclusive U.S. distributor of Plaintiff-manufactured and branded military products. *Id.* ¶ 48. On December 7, 2017, Plaintiff and Zenith entered into a second commercial agency agreement and restructured Zenith's debt to Plaintiff. *Id.* ¶¶ 52, 54–56. On February 12, 2019, Plaintiff and Zenith entered into a third written agreement, again restructuring Zenith's debt owed to Plaintiff, which was to be paid back in

thirteen installment payments. *Id.* ¶ 61. In July 2019, Zenith stopped making payments as required under Section 4.23 of the 2019 agreement. *Id.* ¶ 63. Plaintiff contends that, due to this breach, it terminated the 2019 Agreement as the contract allowed. *Id.* ¶ 64. Then, Plaintiff sent a notice informing Zenith that the 2017 agreement would be terminated in 30 days and the business relationship between Plaintiff and Zenith would be terminated as of October 19, 2019. *Id.* ¶ 65.

During the pendency of the 2013 agreement, the 2017 agreement, and the period in between these fixed term agreements, Plaintiff alleges that it believed Zenith was advertising and selling Plaintiff products in a matter inconsistent with Zenith's contractual obligations of establishing, maintaining, and enlarging Plaintiff's business in the U.S. *Id.* ¶ 67. However, Plaintiff contends that, unbeknownst to it, Zenith made false and/or misleading statements in advertisements concerning Plaintiff and Plaintiff's products, which misled consumers as to who the maker, designer, and/or manufacturer was of the Plaintiff-manufactured firearms that Zenith sold. *Id.* ¶ 69. Throughout its business relationship with Plaintiff, Zenith advertised weapons it purchased from Plaintiff as being "manufactured by skilled workers in the modern factories of the 500-year-old Turkish company, MKE." *Id.* ¶ 72. Yet, on other portions of its website, ZFI advertised the Plaintiff-manufactured firearms under the "Zenith Firearms" trademark and failed to identify that the firearms were associated with Plaintiff. *Id.* ¶ 70. ZFI also made product manuals for Plaintiff-manufactured, Plaintiff-branded firearms that prominently featured ZFI branding, misleading consumers to believe ZFI was the manufacturer. *Id.* ¶ 73. Plaintiff alleges that Defendants used their position as its exclusive U.S. distributor to generate a market for their own firearm, which is directly competitive with Plaintiff's firearms—even going so far as advertising a ZFI firearm as "better than the original" in comparison to a Plaintiff-manufactured

and branded firearm. *Id.* ¶¶ 75–76. In addition, Plaintiff alleges that Zenith's false and misleading advertisement of its firearm is likely to adversely impact Plaintiff's U.S. sales, resulting in continued harm to Plaintiff. *Id.* ¶ 79.

Plaintiff further alleges that around November 24, 2020, when Plaintiff filed its original complaint, Defendants published a Press Release on their website, in which they knowingly made false and misleading claims about Plaintiff, its products, and events related to Plaintiff's business relationship with Defendants. *Id.* ¶ 80. The allegedly false statements in the Press Release were: (1) "that Kaya alerted [Plaintiff] to an alleged bribery scheme, that '[Plaintiff]'s management failed to deal with the problem,' Kaya 'took the case to the authorities[,]' and . . . that Kaya's actions soured the parties' relationship," *id.* ¶ 82 (internal reference omitted); (2) that Plaintiff "'illegally' 'diverted' payments made by Zenith, falsely misrepresenting that 'funds that were sent to [Plaintiff] in mid-2019 for product orders have been diverted to the ammunition debt that Zenith has been working to clear since 2016 . . . .," *id.* ¶ 83 (internal reference omitted); (3) "that [Plaintiff] cancelled 'Zenith's contractual exclusivity as Zenith refused to line pockets and were insistent on necessary corrections being made," *id.* ¶ 84 (internal reference omitted); and (4) "that [Plaintiff] 'intentionally sabotaged' the firearms it shipped to Zenith." *Id.* ¶ 85. After other entities reproduced the Press Release, Defendants removed it from their website. *Id.* ¶ 86. Plaintiff alleges that the Press Release harmed its business and reputation. *Id.* ¶ 87.

Plaintiff asserts that on September 17, 2016, without its knowledge, ZFI fraudulently applied for registration of the Plaintiff Mark with the U.S. Patent and Trademark Office, despite knowing Plaintiff was the owner of the Mark and Zenith did not have Plaintiff's permission to do this. *Id.* ¶¶ 88, 90. In addition, Plaintiff alleges that ZFI and ZQC falsely declared that "no other persons . . . have the right to use the mark in commerce, either in the identical form or in such

near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." *Id.* ¶ 91.

Further, Plaintiff asserts that Defendants modified Plaintiff-manufactured and branded firearms with other parts and sold these modified firearms as Plaintiff-manufactured and branded firearms without Plaintiff's permission. *Id.* ¶ 99. ZFI continued to use Plaintiff's name and Mark in advertising, even after Plaintiff terminated its business relationship with Zenith. *Id.* ¶¶ 100–07. ZFI also used an altered version of the Plaintiff's Mark on its website and in connection with printed media, both during and after Zenith and Plaintiff's business relationship, without Plaintiff's permission. *Id.* ¶¶ 107–11.

Additionally, Plaintiff alleges that, over the duration of their business relationship, Plaintiff issued invoices to ZFI and ZQC, serving as written confirmation of the parties' agreements that Plaintiff would sell and deliver military products to Zenith totaling around $5,000,000. *Id.* ¶ 118. Plaintiff asserts that ZQC owes it $4,481,896.01 plus interest, because ZQC has failed to pay total amounts due pursuant to the 2019 agreement's debt restructuring plan. *Id.* ¶ 135. Plaintiff further contends that Zenith does not follow corporate formalities and intermingles assets and liabilities. *Id.* ¶ 136.

Plaintiff also asserts that "at least ZQI is an alter ego of Kaya and ZQI has assumed Kaya's personally guaranteed obligations," and "at all relevant times, all Defendants acted in concert with one another and all Defendants are liable for all actions alleged herein." *Id.* ¶¶ 137–38.

### III. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose

of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)). "Thus, when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Nevertheless, only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570; *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

### IV. Defendants' Motion to Dismiss

#### A. Plaintiff Can Pierce the Veil to Enforce Liability Against Defendant Kaya Individually

Plaintiff has asserted that "at least ZQI is an alter ego of Kaya and ZQI has assumed Kaya's personally guaranteed obligations," without alleging facts in support of this conclusion. Dkt. 123 ¶ 137. And Plaintiff has not alleged any facts to support the elements of the claims asserted against Defendant Kaya in his individual capacity. So Plaintiff can only assert claims against Defendant Kaya through veil-piercing. Plaintiff has alleged enough facts to support such veil-piercing.

Under Virginia law, courts are "very reluctant to permit corporate veil piercing." *Dana v. 313 Freemason*, 587 S.E.2d 548, 554–55 (Va. 2003). Indeed, "only an extraordinary exception justifies disregarding the corporate entity in order to hold individual stockholders personally liable for a judgment against the corporation." *Id.* (internal reference omitted). This standard

applies to limited liability companies, as well. *E.g.*, *A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, No. 151182, 2016 WL 3213630, at *2 (Va. 2016) (unpublished).

In Virginia, veil piercing is appropriate when an individual uses a corporate entity "to evade a personal obligation, to perpetrate a fraud or a crime, to commit an injustice, or to gain an unfair advantage." *C.F. Trust, Inc. v. First Flight L.P.*, 580 S.E.2d 806, 809 (Va. 2003) (internal reference omitted). As "no single rule or criterion . . . can be applied to determine whether piercing the corporate veil is justified," courts will consider each case "in the context of its own specific circumstances," with piercing the corporate veil justified only "when the unity of interest and ownership is such that the separate personalities of the corporation and the individual[s] no longer exist and to adhere to that separateness would work an injustice." *Dana*, 587 S.E.28 at 500 (internal reference omitted).

District courts have noted that the "Supreme Court of Virginia has not recognized a single set of facts necessary to pierce the corporate veil." *Virginia Brands, LLC v. Kingston Tobacco Co., Inc.*, No. 4:10-cv-00009, 2015 WL 877388, at *1 (W.D. Va. Mar. 2, 2015) (citing *Mid Atl. Eng'g Tech. Servs. v. Miller Hardman Designs, LLC*, No. CL09-2268, 2013 WL 8019593, at *1 (Va. Cir. Ct. Mar. 25, 2013) (internal citation omitted)). Still, they have recognized the following factors as useful in determining whether the corporate veil has been pierced: "the initial capitalization of a corporation, the observation of corporate formalities, the non-payment of dividends, the insolvency of the debtor corporation at the time, the siphoning of funds of the corporation by dominant shareholders, the non-function of other officers or directors, and whether the corporate structure is a sham." *Mid Atl. Eng'g Tech. Servs. v. Miller Hardman Designs, LLC*, No. CL09-2268, 2013 WL 8019593, at *1–2 (Va. Cir. Ct. Mar. 25, 2013) (cited by *Virginia Brands, LLC v. Kingston Tobacco Co., Inc.*, No. 4:10-cv-00009, 2015

WL 877388, at *1 (W.D. Va. Mar. 2, 2015); *Marcus v. Dennis*, No. 1:21-cv-01085, 2022 WL

1527524, at *10 (E.D. Va. May 13, 2022)).

Thus, to pierce the corporate veil under Virginia law, a complaint must include factual

allegations sufficient to allow a court to infer "more than the mere possibility of misconduct,"

and that "'injustice will result from holding' [the Defendant for whom veil-piercing is relevant],

rather than [the corporation itself] primarily liable." *Marcus*, 2022 WL 1527524, at *11 (internal

citation omitted); *see also Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d

545, 548 (4th Cir. 1992) (discussing the "stringency of the Virginia standard" for piercing the

veil). It is not enough to simply "identif[y] the elements often relied upon in establishing a claim

to pierce the corporate veil." *Id.*[2]

Plaintiff fails to allege facts to establish that Defendant Kaya, in his individual capacity,

is liable for any wrongdoing. Plaintiff's Second Amended Complaint asserts seven statements of

fact relating to Defendant Kaya,[3] none of which contend that a corporation at issue was

undercapitalized, that Defendant Kaya siphoned off its funds for personal assets, or that

Defendant Kaya commingled personal assets with any of a corporation's assets. *See* Dkt. 123

¶¶ 9, 11, 13, 15, 82, 131, 137; *Mid Atl. Eng'g Tech. Servs.*, 2013 WL 8019593, at *1–2.

---

[2] For example, the Virginia Supreme Court has refused to pierce the corporate veil when a complaint failed to allege facts that a defendant either commingled corporate and personal assets or siphoned corporate assets to his personal assets. *Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987); *see also National Carloading Corp. v. Astro Van Lines, Inc.*, 593 F.2d 559 (4th Cir. 1979) (piercing the corporate veil on the grounds that a sole shareholder of transferor and transferee corporations effectively converted sole corporate assets for personal use, with the specific intent of defrauding corporate creditors).

[3] Other factual allegations lump Defendant Kaya with the other Defendants without providing factual support for piercing the corporate veil.

Plaintiff, in responding to Defendants' motion to dismiss, asserts that it alleged "sufficient facts to allow the Court to ultimately conclude *at least* that: (1) Kaya, ZFI, ZQI, and ZQC do not observe corporate formalities; (2) Kaya has siphoned funds from the corporation to pay for his personal obligations[;] and (3) the corporate structures of ZFI, ZQI, and ZQC are a sham." Dkt. 134 at 10 (emphasis in original). Most relevant is the factual allegation that the corporate entities that Kaya controlled as CEO agreed to assume his personal debt in the 2019 agreement, as the other statements are conclusory and "devoid of further factual enhancement." *See Nemet Chevrolet, Ltd. v. Consumeraffairs, Inc.*, 951 F.3d 250, 255 (4th Cir. 2009); Dkt. 123 ¶ 131. While the facts alleged do not form as high an evidentiary base as in other cases, *e.g.*, *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 429 (4th Cir. 2011),[4] Plaintiff does allege a significant fact supporting veil-piercing—Plaintiff alleges that one of the corporate entities, ZQI, "agreed to pay an outstanding debt owed by and personally guaranteed by Kaya." Dkt. 123 ¶ 131. As Fed. R. Civ. Pro. 8(e) requires liberal construction of the pleadings, the Court construes this as a fact warranting piercing the veil.

**B. Plaintiff States Plausible Claim that Defendants Breached the 2013 and 2017 Agreements**

---

[4] Plaintiff's citation to *Newport News Holdings Corp.*, 650 F.3d at 429 is readily distinguishable. Dkt. 134 at 11. The case cited, in discussing *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir. 2002), considers factual allegations greater than that which Plaintiff provided. Cited case *Newport News Holdings Corp.* discusses a district court finding veil piercing appropriate because the corporation had no separate identity from the Defendant at issue, who was the corporation's President, sole employee, only participating member of the Board of Directors, only member invited to the Board's meetings, and the individual from whose home the business operated. *Newport News Holding Corp.*, 650 F.3d 423 at 434. Plaintiff has not alleged similar facts regarding Defendant Kaya.

– 10 –

Defendants have moved to dismiss Plaintiff's claims that they breached the 2013 and 2017 agreements, asserting that Plaintiff failed to plead sufficient facts to meet the *Twombly*, 550 U.S. at 555, standard. Dkt. 131 (Ex. 1) ¶ 17.

To assert a breach-of-contract claim under Virginia law, a Plaintiff must allege the following: (1) a legally enforceable obligation owed by Defendant to Plaintiff; (2) Defendant's violation of that obligation; and (3) damage to Plaintiff as a result of the breach. *Riley v. Barringer*, 337 F. Supp. 3d 647, 654 (W.D. Va. 2018) (citing *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006)).

Plaintiff's complaint alleges that any debt in dispute in the 2013 agreement was restructured into the 2017 agreement; then the parties entered into the 2019 agreement, again restructuring the debt ZQC owed to Plaintiff. Dkt. 123 ¶¶ 125, 127–29. Plaintiff also claims that ZQC owes $3,381,896.01 because of its failure to pay the amounts due pursuant to the 2019 agreement's debt restructuring. *Id.* ¶ 135. For their part, Defendants assert that Plaintiff has not pled facts that, taken as true, would establish Plaintiff incurred any damages as a result of the alleged breaches of the 2013 and 2017 agreements, because the 2019 agreement restructured these debts. Dkt. 131 ¶ 19.

The complaint includes the conclusory allegation that "Defendants' breach of the [2013 and 2017] Agreement[s] caused [Plaintiff] to sustain damages in an amount to be determined at trial." Dkt. 123 ¶¶ 224, 233. Plaintiff argues that it sustained damages as a result of Defendants' material breach of their obligations pursuant to Sections 4.2 and 4.3 of the 2013 and 2017 agreements, which required Defendants "to establish, maintain, and enlarge MKE's business in the United States." *Id.* ¶¶ 224, 233. Plaintiff argues Defendants breached their contractual obligations through false advertisement. *Id.* ¶¶ 223, 232. Damages cannot be contingent,

speculative, or uncertain, *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009), and Defendants argue that this means Plaintiff's claim regarding breach of the 2013 and 2017 agreements should be dismissed for failure to state a claim.

Under Virginia law, if a plaintiff fails to prove damages after presenting its case in chief, claim dismissal is warranted. *Id.* at 136. But Plaintiff has sufficiently alleged the element of damages at this stage of litigation. Defendants' motion to dismiss the claims related to the 2013 and 2017 agreements will be denied.

### C. Plaintiff's Cancellation Claims Have Standing

Plaintiff asserts that Defendants illegally filed a trademark application for the MKE Mark, and

> [c]ancellation of Defendants' registration of a trademark identical to the MKE Mark is appropriate because it is a mark which consists of or comprises a mark which so resembles the MKE Mark previously used in the United States by MKE and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, mistake or to deceive.

Dkt. 123 ¶¶ 163, 166. Standing for cancellation claims requires a reasonable belief that the party bringing the claims is likely to be damaged by the trademark registration. *E.g.*, *Pro-Football, Inc. v. Blackhorse*, 62 F. Supp. 3d 498, 504 (E.D. Va. 2014); *see also Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 715 (4th Cir. 2016) (discussing that "'[a]ny person who believes that he is or will be damaged' by the mark's registration may petition for cancellation under § 14(3) [of the Lanham Act], just as 'any person who believes that he or she is or is likely to be damaged' may bring an unfair competition action under § 43(a)") (quoting *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). Plaintiff has the requisite standing to assert its claims for cancellation of a trademark due to (1) likelihood of confusion and (2) fraud (collectively Plaintiff's "cancellation claims").

Defendants assert that, as Defendant ZFI voluntarily surrendered the trademark at issue on April 20, 2022, Plaintiff no longer retains standing to brings its cancellation claims. Dkt. 131 (Ex. 1) ¶ 23.[5] The Fourth Circuit has not considered a case in which a party voluntarily surrenders a trademark. But in an analogous case, the Ninth Circuit held that a defendant lacked standing to assert counterclaims for cancellation of trademarks when the plaintiff had already surrendered the eight disputed trademark registrations at issue. *Amusement Art, LLC v. Life is Beautiful, LLC*, 768 F. App'x 683, 687 (9th Cir. 2019).[6] The Ninth Circuit remanded to the district court to reconsider the extent to which the fee award "should be adjusted to exclude fees that were incurred unnecessarily *following* [the] surrender of the eight registrations at issue." *Id.* at 688 (emphasis added). Here, Plaintiff has standing, as, at least for the period *leading up to* Defendants surrendering the trademark, Plaintiff put forward factual allegations supporting that Plaintiff was likely to be damaged by the registration. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) ("The party seeking cancellation must prove two elements: (1) that it has standing; and (2) that there are valid grounds for cancelling the registration. . . . Standing is the more liberal of the two elements and requires only that the party seeking cancellation believe that it is likely to be damaged by the registration.").

### V. Plaintiff's Motion to Dismiss Defendants' Counterclaims

Defendants raise three breach of contract counterclaims, related to alleged breaches of their contracts with Plaintiff executed in 2013, 2017, and 2019.

---

[5] This does not relate to trademark infringement claims, which are not mooted by voluntary abandonment. *See Frisch's Restaurant v. Shoney's*, 759 F.2d 1261, 1270 (6th Cir. 1985).

[6] Plaintiff's only response to this analogy is that "[t]o establish that Plaintiff has standing to seek cancellation of a registered trademark, Plaintiff must show that it has a 'real interest' in the cancellation proceeding[,] 15 U.S.C.A. § 1064," and "Plaintiff can show real interest by alleging that it is likely to be damaged by Defendants' registration. [*Id.*]." Dkt. 134 at 6.

### A. Defendants State a Plausible Claim that Plaintiff Breached the 2019 Contract

Defendants counterclaim that Plaintiff breached the parties' 2019 contract by (1) failing to deliver Defendants' firearms in exchange for a May 28, 2019 down payment and (2) applying Defendants' May 28, 2019 payment to Defendants' outstanding debt. Dkt. 132 ¶¶ 53, 44. Plaintiff moves to dismiss this counterclaim, arguing that Plaintiff was not contractually obligated to deliver firearms to Defendants in exchange for the May 28, 2019 payment, as Defendants allege. Dkt. 142 at 4. Further, Plaintiff contends that it was not obligated to return Defendants' down payment. *Id.*

As stated above, to assert a breach-of-contract claim under Virginia law, a Plaintiff must allege the following: (1) a legally enforceable obligation owed by Defendant to Plaintiff; (2) Defendants' violation of that obligation; and (3) damage to Plaintiff as a result of the breach. *Riley*, 337 F. Supp. 3d at 654 (citing *Ulloa*, 624 S.E.2d at 48).

Defendants allege that "[p]ursuant to the 2019 Contract, [Plaintiff] had a duty to ship to ZQC, ZFI, and ZF properly manufactured firearms consistent with the schedule stated in the 2019 Contract," "[Plaintiff] repeatedly and materially breached its duties in connection with the 2019 Contract by delivering sub-standard firearms," and "despite [Plaintiff]'s breaches, ZQC, ZQI, and ZF attempted to find a means for the parties to fulfill the original purpose of the 2019 Contract," thus "notif[ying] [Plaintiff] that ZQC, ZQI, and ZF would be unable to timely make payment for the June 2019 shipment of firearms until the defects in the April 2019 shipment of firearms were remedied such that those firearms could be sold." Dkt. 132 ¶¶ 48–51. Further, Defendants allege that "[o]n May 28, 2019, [Plaintiff] received the $578,000.00 down-payment for the next batch of firearms," but "instead of performing its reciprocal duty and delivering that batch of firearms, [Plaintiff] kept the down-payment, refused to deliver any additional batches of

firearms for at least another year, and declared that it would no longer abide by the terms of the 2019 contract." *Id.* ¶¶ 52–53. Defendants assert that, due to Plaintiff's material breaches, Defendants incurred damages in the form of

> (1) the down-payment [Plaintiff] kept; (2) the profits they would have earned in selling the firearms [Plaintiff] promised to deliver per the 2019 contract . . .; (3) expenses [Defendants] incurred in handling repairs and other warranty work in conjunction with the defectively-manufactured firearms [Plaintiff] shipped; and (4) compensation for the foreseeable harms [Plaintiff]'s breaches have caused to [Defendants] to incur in the form of things of value [Defendants] have had to give . . . incident to [Plaintiff]'s breaches.

*Id.* ¶ 55. Thus, Defendants allege facts sufficient to state a plausible breach-of-contract claim under Virginia law.

However, Plaintiff argues that, under the 2019 contract, "[a]s a condition precedent to [Plaintiff] making timely shipments, Defendants were required to make 'timely payments' pursuant to the 2019 Agreement's terms," which they failed to do. Dkt. 142 at 3–4 (citing Dkt. 132 (Ex. A) § 4.2.16). Plaintiff explains that

> Defendants **admit** that they informed [Plaintiff] in *early* May, 2019 that they wouldn't be able to make payments on time and in accordance with the 2019 contract, and they also admitted that they failed to stay current on their debt installments, which was an additional condition precedent to [Plaintiff] not delaying firearms shipments.

Dkt. 142 at 4 (citing Dkt. 132 ¶¶ 151, 43) (emphasis in original). Plaintiff also recognizes that "Defendants acknowledge that [Plaintiff] was willing to provide Defendants with firearms for which the down payment was made." *Id.* (citing Dkt. 132 ¶ 53).

Plaintiff argues that "Defendants' own pleading demonstrates that [Plaintiff] was not contractually obligated to provide firearms to Defendants under the terms of the 2019 agreement," based on the material breaches presented above, Dkt. 142 at 4. Further, as Plaintiff describes "[b]ecause, as they themselves allege, Defendants were in breach of their obligations under the 2019 Contract, the proffered payment was not a 'down payment' for any order

pursuant to that contract." *Id.* The 2019 agreement itself appears to support these allegations. *Id.*
(Ex. A § 4.2.13) ("ZQC confirms to perform the payment by wire transfer through a first class
Turkish Bank (Halkbank) with 40% down payment 3 months in advance of each scheduled
shipment, and the remaining 60% shall be completed in 3 days after the receipt of shipment note
and the confirmation of ZQC's freight forwarder's receipt of the goods."); *id.* (Ex. A § 4.2.9)
("ZQC confirms that the performance of enclosed delivery plan will be performed on the
condition that performance of the related payments and the issuance of the L/C or the cash
payments on the agreed time frame."); *id.* (Ex. A § 4.2.14) ("In case of a request from ZQC to re-
negotiate the payment plan or to ask for an intermittent payment delay, this request shall be
communicated to [Plaintiff] ten days prior to the payment date. [Plaintiff], after evaluating the
request, may accept or reject the request."). This is a question of contractual analysis in which
factual allegations support both parties' arguments, and thus, this claim will survive the motion
to dismiss. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (showing that the low
pleading standard for a motion to dismiss does not require the Court to resolve conflicts in the
facts); *see also W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 404 (4th Cir.
2019) (explaining that the court would not "settle conclusively" between competing
interpretations of a contract "at the summary judgment stage," when each "proffered
interpretation is, at the very least, reasonable").

## B.  Defendants State a Plausible Claim that Plaintiff Breached the 2017 Contract

In their Counterclaim, Defendants argue that Plaintiff "repeatedly and materially
breached its duties in connection with the 2017 contract by failing to produce and prepare
firearms as requested by ZQC." Dkt. 132 ¶ 60. Defendants allege that "[p]ursuant to the 2017
Contract, [Plaintiff] had a duty to ship to ZQC, ZQI, and ZF properly manufactured firearms

consistent with the schedule stated in the 2017 Contract. Firearms were to be manufactured to the standards acceptable in the U.S. market." *Id.* ¶ 59. Despite this duty, after ZF made a payment for 250 firearms in August 2018, Plaintiff "prepared to send the shipment, but at the last moment, [Plaintiff] balked, refused to make the agreed firearm delivery, applied the payment to the remaining ZQI debt, and pulled the shipment from the dock, which caused ZF reputational and other harm." *Id.* ¶ 61. More specifically, Defendants contend that

> [Plaintiff]'s material breaches caused ZQC, ZQI, and ZF to incur damages in the form of [1] the down-payment [Plaintiff] kept; (2) the profits they would have earned in selling the firearms [Plaintiff] promised to deliver per the 2017 Contract . . .; and (3) compensation for the foreseeable harms . . . including, but not limited to reputation and other harm.

*Id.* ¶ 63.[7]

Responding to Defendants' counterclaim, Plaintiff alleges that the 2017 contract does not include the 'obligation' that Defendants allege Plaintiff breached. Dkt. 142 at 5. Although Defendants allege that the contract required Plaintiff to "produce and prepare firearms as requested by ZQC," Dkt. 132 ¶ 60, Plaintiff alleges that "[Plaintiff] was free to reject orders placed by Defendants, and [Plaintiff] was only obligated to produce and prepare products *mutually agreed* upon by the parties." Dkt. 142 at 5 (emphasis in original). Supporting this allegation, Plaintiff cites Sections 4.8 and 5.1 of the 2017 contract. Section 4.8 presents that the "[a]gent shall inform the Principal the coming year's order until October of current year. Principal has the right to accept or refuse the order." *Id.* (Ex. B) at 5. Section 5.1 states that "Principal will produce and prepare the products requested by Agent and agreed upon mutually . . . ." *Id.*

---

[7] No argument is made regarding dismissal related to inability to determine reputational harm damages.

To survive a motion to dismiss, the counterclaim must allege facts sufficient to fulfill the elements of a breach-of-contract claim under Virginia law, which, in the sale of goods context, includes the Virginia Uniform Commercial Code ("Virginia UCC"), Virginia Code §§ 8.1A-101-8.1A-310; 8.2-107-8.2-725 (2005). *Wells, Waters & Gases, Inc. v. Air Prod. & Chemicals, Inc.*, 19 F.3d 157, 159 (4th Cir. 1994). The Virginia UCC states: "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract or sale has been made between the parties and signed by the party against whom enforcement is sought." Va. Code Ann. § 8.2-201(1); *Innotec LLF v. Visiontech Sales, Inc.*, No. 3:17-cv-00007, 2018 WL 1804345, at *8 (W.D. Va. Mar. 16, 2018). This statute of frauds provision "is not a rule of evidence and is not involved in making the determination of whether or not an oral agreement was in fact made. It simply makes unenforceable those contracts that do not have the support of some signed writing." *A.C. Furniture, Inc. v. Arby's Restaurant Group, Inc.*, No. 4:14-cv-00029, 2014 WL 4961055, at *3 (W.D. Va. Oct. 3, 2014) (quoting *Rapoca Energy Co., L.P. v. AMCI Export Corp.*, No. 1:00-cv-00162, 2001 WL 401424, at *4 (W.D. Va. Apr. 17, 2001)).

Plaintiff contends that "Defendants fail to allege the existence of a signed writing sufficient to indicate that a contract for sale of the purported 250 firearms was made. Defendants have thus failed to sufficiently allege that [Plaintiff] breached an obligation to Defendants." Dkt. 142 at 6; *see also* Dkt. 123 (Ex. 2) at 4 (showing that, though the contract never mentions a particular sale for 250 firearms, it states: "Principal will produce and prepare the products requested by Agent and agreed upon mutually in accordance with the technical specification and Agent's requirements based on related factory's production plan."); Dkt. 132 ¶ 25 (Second Amended Counterclaims stating "[i]n August 2018, ZF made a payment for 250 firearms, MKE

– 18 –

prepared to send the shipment, but at the last moment, MKE balked, refused to make the agreed firearm delivery, applied the payment to the remaining ZQI debt, and pulled the shipment from the dock . . . ."). In the secured transactions context, other district courts in this Circuit have reasoned, when considering a motion to dismiss, that, "[i]n line with the mandate in Fed. R. Civ. Pro. 8([e]) that pleadings are to be liberally interpreted," that they should "construe[] [the] complaint to allege that the [contract] constitutes [a written agreement describing the collateral to be pledged]." *Thomas v. Branch Banking and Trust Co.*, 443 F. Supp. 2d 806, 809 n.4 (N.D. W.Va. 2006). Similarly, in adhering to Fed. R. Civ. Pro. 8(e), this Court construes the pleadings to allege that the contract was a signed writing.[8]

Plaintiff also argues, in response to Defendants' assertion that Plaintiff "breached its contractual obligations by failing to return Defendants' down-payment and instead applying it to Defendants' outstanding debt to [Plaintiff]," that "[t]he 2017 Contract did not obligate [Plaintiff] to apply the August, 2018 payment toward a rejected order, and [Plaintiff] was fully entitled to apply it toward Defendants' outstanding debt obligations." Dkt. 142 at 6. However, as Defendants have alleged two other bases for damages beyond the down-payment, i.e., "the profits they would have earned in selling the firearms [Plaintiff] promised to deliver per the 2017 Contract," and "compensation for the foreseeable harms . . . including, but not limited to reputation and other harm," Dkt. 132 ¶ 63,[9] Defendants have alleged facts sufficient to support a breach-of-contract counterclaim. Therefore, Plaintiff's motion to dismiss this count of the counterclaims will be denied.

## C.  Defendants State a Plausible Claim that Plaintiff Breached the 2013 Contract

---

[8] Enough facts are alleged to support the other elements of a breach-of-contract claim and the 2017 Contract was signed by both parties. *See, e.g.*, Dkt. 142 (Ex. B).

[9] Again, no argument is made regarding dismissal related to inability to determine reputational harm damages.

Defendants also assert that "[Plaintiff] repeatedly and materially breached its duties in connection with the 2013 Contract by refusing to hold [Zenith] harmless for the losses, damages, and expenses [] incurred and suffered arising out of the parties [sic] activities relating to the 2013 Contract." Dkt. 132 ¶ 68. Defendants argue that "[Plaintiff]'s breaches caused [Defendants] to incur damages in the form of (1) outstanding debt, expenses, damages, and losses arising out of the parties [sic] activities relating to the 2013 Contract, which according to [Plaintiff] totaled over $5 million; and (2) compensation for the foreseeable harms . . . ." *Id.* ¶ 71. Specific allegations include the following: "In or around 2014, retail prices for ammunition in the U.S. market plummeted, and ZQI could not keep up with its payments to [Plaintiff]." *Id.* ¶ 69. "[Plaintiff] refused to hold [Defendants] harmless against the sudden drop in ammunition prices which related to the activities arising out of the 2013 Contract," *id.*, even though, "[p]ursuant to the 2013 Contract, [Plaintiff] had a duty to 'indemnify and hold harmless [Defendants] against any losses, damages, or extra expenses which may incur, suffer or to be required to pay arising out of either parties activities relating to . . . this contract," *id.* ¶ 67. Further, Defendants contend that "in April 2016, [Plaintiff] violated its duty of good faith and fair dealing under the 2013 Contract when one of its employees . . . committed acts of espionage, exploited state secrets, and attempted to bribe Defendant Kaya, all of which interfered with the 2013 Contract and damaged the Parties [sic] business relationship." *Id.* ¶ 70.

Plaintiff contends that this claim is time-barred. Dkt. 142 at 7. Plaintiff argues that the Virginia UCC governs the limitations period of the 2013 agreement, since the contract is primarily for the sale of goods, i.e., ammunition. *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 855 (4th Cir. 2003) (unpublished). The Virginia UCC has a four-year statute of limitations period. Va. Code § 8.2-725 (1) ("An action for breach of any contract for sale must be

– 20 –

commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.").[10] Under the Virginia UCC, "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 8.2-725(2). Here, Plaintiff invoiced Defendants for ammunition on October 2, 2015, and November 24, 2015, and ZQI defaulted on the November 24, 2015 payment. Dkt. 123 ¶¶ 50–54. The Agreement was executed on October 10, 2013 and expired on October 10, 2016. *Id.* ¶¶ 44, 49. Thus, all relevant dates are more than four years from the July, 2022 date in which the counterclaim was filed. Dkt. 132.

Defendants initially argued that Turkish law governs the 2013 agreement, based on Plaintiff's expert report, and thus argued that a ten-year statute of limitations exists. Dkt. 148 at 10–11.[11] The 2013 agreement indeed states: "This Agreement shall be carried out in accordance with the Foreign Trade Regulations of Turkey." Dkt. 123 (Ex. 1) at 5.[12] In determining choice of law when a case is before a federal district court based on diversity of citizenship, the court applies the choice-of-law rules of the forum state, which, in this case, is Virginia. *See, e.g.*, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "Virginia has long recognized that parties to a contract may agree in advance which jurisdiction's law will

---

[10] An unsigned contract for services has a three-year limitations period and a signed contract for services has a five-year limitations period. Va. Code §§ 8.01-246, 8.2-725.

[11] However, after the Court granted Defendants' Motion to File an Amended Answer, Dkt. 191, Defendants added as a defense that "MKE's claims are barred, in whole or in part, because of the applicable statute of limitations," Dkt. 209 ¶ 18. Defendants previously stated that "[i]f Defendants' claims are time-barred, [Plaintiff]'s are too," with regards to the 2013 contract. Dkt. 148 at 10. Thus, with this cross-motion, if Defendants' claims regarding the 2013 contract are dismissed based on statute of limitations, Plaintiff's 2013 contract-related claims must also be dismissed.

[12] In their pleadings, the parties argue the suit's merits in reliance on Virginia law, nonetheless.

apply to their transaction." *Zaklit v. Glob. Linguist Sols., L.L.C.*, No. 1:14-cv-314, 2014 WL

3109804, at *5 (E.D. Va. July 8, 2014). And "absent a showing that the provisions of the

[choice-of-law] clause 'are unfair or unreasonable, or are affected by fraud or unequal bargaining

power,' or that the parties did not clearly intend for the designated law to govern the terms of the

contract, [Virginia courts] will give full force to choice-of-law provision[s] in a contract."

*Senture, L.L.C. v. Dietrich*, 575 F. Supp. 2d 724, 727 (E.D. Va. 2008) (internal citations omitted)

(quoting *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990); citing *Black

v. Powers*, 628 S.E.2d 546, 555 (Va. Ct. App. 2006)).

A district court may consider the statute of limitations—an affirmative defense—at the

motion to dismiss stage when the facts establishing the defense are apparent on the face of a

plaintiff's complaint. *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2007). Since the facts

establishing the defense are not facially apparent, the Court will not dismiss the 2013 contract

claim based on a statute of limitations defense.

Still, Plaintiff asserts that even if Defendants' counterclaim related to the 2013 agreement

is not time-barred, it does not allege sufficient facts to show that Plaintiff breached a valid

contractual obligation. Defendants argue that Plaintiff breached the 2013 contract in 2016 by

violating the duty of good faith and fair dealing, as one of Plaintiff's employees "committed acts

of espionage, exploited state secrets, and attempted to bribe Defendant Kaya," thereby

"interfer[ing] with the 2013 Contract and damag[ing] the Parties [sic] business relationship."

Dkt. 142 at 9. However, Defendants nowhere allege that the employee's conduct breached

Plaintiff's obligations under the 2013 contract. *Id.* Defendants also allege that, after the arrest of

the employee who committed said acts, Plaintiff "failed to provide ZQC, ZQI, or ZF with

weapons pursuant to the 2013 agreement, claiming that its finite inventory of weapons must first

be used to satisfy weapons orders from the Turkish government before providing Zenith whatever inventory remained as justification for its breach." Dkt. 132 ¶ 24.

Under Virginia law, a claim for breach of the implied covenant of good faith and fair dealing requires: "(1) a contractual relationship between the parties, and[,] (2) a breach of the implied covenant." *Walker v. Hill*, No. 3:20-cv-149, 2021 WL 1062238, at *9 (E.D. Va. Mar. 19, 2021) (quoting *Smith v. Flagstar Bank, F.S.B.*, No. 3:14-cv-741, 2015 WL 1221270, at *6 (E.D. Va. Mar. 17, 2015) (internal quotations and citations omitted)). Further, "[a] breach of this duty . . . 'gives rise only to a cause of action for a breach of contract.'" *Id.* (quoting *Smith*, 2015 WL 1221270, at *6) (internal quotations and citations omitted). The alleged breach thus must be of a legally enforceable contractual obligation between the parties. *Id.*

Taking the allegations in Defendants' counterclaim as true and drawing all reasonable inferences in their favor, Plaintiff's employee's acts fail to state a plausible breach of contract claim. The Defendants assert that the employee's conduct interfered with the 2013 contract and damaged the parties' business relationship, without providing any facts regarding damages that arose. *See Nemet Chevrolet, Ltd.*, 951 F.3d at 255. But the allegation that Plaintiff failed to provide ZQC, ZQI, or ZF with weapons pursuant to the 2013 agreement allows this count of the counterclaims to survive.

### D.  Defendants Allege Enough Facts to Support an Unjust Enrichment Claim

In their final counterclaim, Defendants argue that Plaintiff has "been unjustly enriched by [Zenith] settling what was a $30,000,000 judgment and is now a $70,000,000.00 judgment on its behalf for $4,470,000.00, without conferring onto Defendants the benefit of being [Plaintiff]'s exclusive U.S. distributor following the settlement of the Ohntrup Judgement . . . ." Dkt. 132 ¶ 77. That is, they assert that Plaintiff was unjustly enriched because after Defendants settled the

judgment, Plaintiff revoked Defendants' exclusive distributorship. This counterclaim stems from the alleged fact that in 1984, Plaintiff, "to avoid the execution of an $847,000 judgment ('Ohntrup Judgment') against it for injuries caused by one of its defective firearms, left the United States gun and ammunition market." *Id.* ¶ 15. The value of this judgment exceeded $30 million by 2012. *Id.* Defendants alleged that Plaintiff "contracted with ZQI for ZQI to resolve the Ohntrup Judgment debt on [Plaintiff]'s behalf . . . The parties contemplated that ZQI would be the exclusive importer of [Plaintiff]'s ammunition into the U.S." *Id.* ¶ 18.

A cause of action for unjust enrichment can be available even when an express contract exists. *See Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *5 (4th Cir. 2021) (unpublished) (per curiam) (citing *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 648 (Va. 2020) (internal reference omitted)). "[U]nder Virginia and federal law, a plaintiff is permitted to plead equitable theories of relief such as unjust enrichment and *quantum meruit* as alternatives to contract recovery." *Mendoza v. Cederquist*, No. 1:09cv163 (LMB/IDD), 2009 WL 1254669, at *3 (E.D. Va. May 6, 2009) (citing *Ford v. Torres*, No. 1:08cv1153, 2009 WL 537563, at *4 (E.D. Va. Mar. 3, 2009)).

A plaintiff establishes a claim for unjust enrichment if three elements are met: "(1) a benefit conferred on [non-claimant] by the [claimant]; (2) knowledge on the part of the [non-claimant] of the conferring of the benefit; and (3) acceptance or retention of the benefit by the [non-claimant] in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 707 (E.D. Va. 2006). Defendants alleged sufficient facts to establish an unjust enrichment claim.

### V. Conclusion

– 24 –

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's breach of contract claims for the 2013 and 2017 agreement and Plaintiff's cancellation claims will be denied.

Defendants' counterclaims regarding breaching the 2019, 2017, and 2013 contracts and Defendants' unjust enrichment claim will also survive.

* * * *

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this _17th__ day of February, 2023.

           NORMAN K. MOON
           UNITED STATES DISTRICT JUDGE