**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **MAKINA VE KIMYA<br>ENDUSTRISIS A.S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:20-cv-00072** |
| **v.** | ) | |
| | ) | |
| **KUTLAY KAYA, ET AL,** | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Makina ve Kimya Endustrisi Kurumu, A.S. ("MKE"), initiated this suit against

defendants Kutlay Kaya, Zenith Quest Corporation, Zenith Quest International, Inc., and Zenith

Firearms, Inc. (defendants collectively "Zenith") alleging claims for trademark infringement,

breach of contract, unjust enrichment, false advertising, and defamation. Zenith counterclaimed

for breach of contract and unjust enrichment.

Before the court are competing motions for summary judgment. Dkt. 215, 216. MKE

moves for partial summary judgment on its own claims in the Second Amended Complaint for

unfair competition, trademark infringement, and cancellation of trademark registration due to

fraud and damages, all under the Lanham Act, as well as common law unfair competition, and

breach of contract for the parties' 2019 Agreement (Counts I, II, IV, V, and VII). MKE also

moves for summary judgment on Zenith's counterclaims for breach of contract for the parties'

2013, 2017, and 2019 Agreements, and unjust enrichment (Counterclaim Counts I-IV). For its

part, Zenith asks for summary judgment on all MKE's claims, as well as Counts I, II and IV of

its counterclaim.[1] Also pending are multiple motions to exclude experts, as well as motions for leave to amend the pleadings and for leave to file additional summary judgment motions, which the court will largely address by separate opinion.  I **GRANT** the motions for summary judgment, in part, and dismiss the following claims and counterclaims: I dismiss MKE's claims in Count III (as moot), Count VI, Count VIII, Count IX, Count X, Count XI, Count XIII, Count XV, Count XVI (defamation)[2] and Count XVII. I dismiss Zenith's Counterclaim Count II, Counterclaim Count III, and Counterclaim Count IV. I **DENY** the motions for summary judgment as to the other claims and counterclaims.

## I.      Factual Background

MKE is a Turkish company that manufactures and exports military products, including weapons, to the United States, as well as other countries. Dkt. 217 at 3;Yasin Akdere, Decl. Dkt. 5-1 at 93-97 ¶ 3. MKE was founded in 1950 and registered its circular blue and yellow trademark (the "MKE mark") in Turkey in 1980. Dkt. 217 at 3; Akdere Decl. ¶ ¶ 6, 8; Dkt. 123 ¶¶ 27-28. MKE first entered the United States gun market in 1974. Dkt. 217 at 4; Dkt. 215-1 at 4.

Defendant Kutlay Kaya formed Zenith Quest International, LLC in 2010 under the laws of Virginia, which became Zenith Quest International, Inc. by 2014. Dkt. 123 ¶ 9; Amended Answer, Dkt. 209 ¶ 9. Zenith Firearms, Inc. and Zenith Quest Corporation were both incorporated in 2014 under the laws of Virginia. Id. at ¶¶ 12, 14.  MKE alleges that defendant Kaya is the chief executive officer of Zenith Quest International, Inc., Zenith Firearms Inc., and Zenith Quest Corporation, which defendants deny. Dkt. 123 at ¶¶ 11, 13, 15; Dkt. 209 at ¶¶ 11,

---

[1] Counterclaim Count III, breach of the 2013 Agreement is the sole claim on which Zenith did not move for summary judgment. However, as discussed below, both parties' claims regarding the 2013 Agreement are barred by the statute of limitations.

[2] The Second Amended Complaint has no Count XIV, and there are two Counts XVI (false advertising and defamation), the false advertising count will continue, while the defamation count is dismissed.

13, 15.  In her Declaration dated January 2023, Hanri Kaya states that she has been an owner of Zenith Quest Corporation and its subsidiaries "including Zenith Quest International, Inc. and Zenith Firearms, Inc" since 2010.[3] Dkt. 225-1.

Prior to filing this lawsuit, MKE and Zenith had an ongoing business relationship, including entering into the contracts in 2013, 2017 and 2019.

### A. The 2013, 2017 and 2019 Agreements

On October 10, 2013, MKE and Zenith Quest International, Inc. entered into a commercial agency agreement ("the 2013 Agreement"), which appointed Zenith as MKE's exclusive U.S. distributor for MKE products, specifically ammunition. Dkt. 217-2. As part of the consideration for appointing Zenith as MKE's exclusive U.S. distributor, Zenith agreed to settle a civil judgment against MKE from the 1980s ("the Ohntrup Judgment").[4] Dkt. 215-1 at 4, Dkt. 217 at ¶ 8; Dkt. 217-3; Waiver Agreement signed October 23, 2013, Dkt. 217-3. The 2013 Agreement provided that it shall "remain in force for a period of three years" and may thereafter be renewed by mutual agreement and "will remain valid until the completion of the agreement between Ohntrup and Kutlay Kaya, in case it is in line with MKE benefits." Dkt. 217-2, ¶ 2.

---

[3] While Zenith Quest International, LLC and Zenith Quest International, Inc. existed before Zenith Firearms Inc. and Zenith Quest Corporation, and thus, the later companies did not exist at the time of the 2013 Agreement, I refer to all the company defendants jointly as "Zenith" as distinguishing between them is not necessary in this opinion. Indeed, Zenith's brief refers to all defendants collectively, and the Second Amended Complaint alleges that "all Defendants acted in concert with one another and all Defendants are liable for all actions herein." Dkt. 123 ¶ 138.

[4] The district court entered judgment against MKE in the amount of $ 847,173.97 after trial. See Ohntrup v. Firearms Ctr., Inc., 802 F.2d 676, 677 (3d Cir. 1986) citing Appeal of Makina ve Kimya Endustrisi Kurumu, 760 F.2d 259 (3rd Cir.1985), affirming mem., Ohntrup v. Firearms Center, 516 F.Supp. 1281 (E.D. Pa.1981). Zenith claims that the judgment had "grown to approximately $50 million" by 2019. Dkt. 215-1; Dkt. 215-5, ¶ 9.

In 2017[5], MKE and Zenith entered into a new contract ("the 2017 Agreement"), likewise designating Zenith as its exclusive distributor of MKE products in the U.S., including its entire product range. Dkt. 217-7. MKE states that the debt incurred by Zenith under the 2013 Agreement was restructured in a "ancillary, contemporaneously executed agreement" entered into between the parties, called the Payment Protocol, which listed the "total current debt amount" as $5,305,181.32, and included a payment schedule to retire the debt. Dkt. 217 ¶¶ 14–15; Dkt. 217-8. MKE argues that Zenith failed to repay this outstanding debt, as outlined by the Payment Protocol. Dkt. 217 at 14. Hanri Kaya acknowledges that the outstanding debt Zenith "may have owed MKE" from the 2013 Agreement was rolled into the 2017 Agreement, but she claims that MKE failed to send the number of weapons it had promised under the Agreement. Dkt. 225-1, ¶ 7. Hanri Kaya claims that MKE represented it would send Zenith "more than 60,000 weapons pursuant to the shipping schedule it sent . . . while only shipping [Zenith] 650 weapons, many of which were defective." Id. The 2017 Agreement states it "shall remain in force for a period of two years" and thereafter may be renewed by mutual agreement and "will remain valid until the completion of agreement between Ohntrup and Kutlay Kaya, in case it is in line with Principal's benefits." Dkt. 217-7, ¶ 2.

In 2019, MKE and Zenith entered into a third contract ("the 2019 Agreement"), which was set to remain in force until April 30, 2020. Dkt. 217-10. The terms of the 2019 Agreement included that Zenith finalize payment of the Ohntrup Judgment so the "case will be closed by June 1, 2019." Dkt. 217-10, ¶ 4.2.1. The 2019 Agreement also included a payment plan for Zenith's outstanding debt to MKE, with payments in 13 installments, as well as a delivery plan

---

[5] Zenith indicates this Agreement was entered into on December 7, 2017, while MKE indicates it was entered into on July 12, 2017 (Comp. Dkt. 215-1 at 5 with Dkt. 217 ¶ 13). The confusion may stem from the Turkish method of writing dates, as DD/MM/YY (07/12/17), compared to the U.S. method of MM/DD/YY (12/07/17). This date discrepancy is immaterial in this case.

for MKE firearms to Zenith. MKE made an initial shipment of firearms, but on March 21, 2019, Zenith sent MKE a letter indicating that the firearms were defective because of certain "quality control issues." Dkt. 215-5; Dkt. 225-1. Hanri Kaya traveled to Turkey in late March 2019, to meet with MKE employees and also inspected firearms. Dkt. 225-1. Hanri claims that, of the 100 firearms she inspected, she noticed "the same functional and cosmetic defects that were present in MKE's March shipment." Id.

Zenith "satisfied the Ohntrup Judgment in full" in May 2019.[6] Dkt. 215-1. Zenith claims that, in addition to satisfying the Ohntrup judgment, it made a down payment for firearms in the amount of $578,000. MKE sent two firearm shipments, but on July 10, 2019, Zenith advised MKE that both weapon shipments received had "severe factory defects that resulted in delays of processing of the shipment" and asking whether the third shipment is "nearing completion" or whether a refund would be issued. Dkt. 215-5. MKE did not issue a refund and did not ship additional firearms. Instead, MKE sent Zenith a letter dated August 28, 2019, indicating that Zenith had not fulfilled its obligations under the 2019 Agreement, by failing to provide the required 40% down payment three months in advance of scheduled shipments, and not making the installment payments within the first ten days of the month. Dkt. 217-12. Specifically, MKE states that, as of August 28, 2019, it should have received the July and August installment payments. Id. The 2019 Agreement specified a penalty of 0.2 percent per day if the payments were not made within the 10-day period and provided that if the total accrued penalty exceeded 6% of the monthly installment, then MKE could terminate the Agreement. Dkt. 217-10, ¶ 4.2.7. Thereafter, Zenith did not make any further payments, and MKE sent a letter on September 19,

---

[6] Zenith indicates in its Motion for Leave to File an Amended Counterclaim that it settled the Ohntrup Judgment for $4,470.000. Dkt. 276.

2019 terminating both the 2019 Agreement and the exclusive representation agreement as of October 19, 2019. Dkt. 217-13.

### B. Trademark

In September 2016, Zenith submitted a trademark application with the United States Patent and Trademark Office ("USPTO"), applying for registration of the MKE Logo. On April 18, 2017, the USPTO registered the trademark. Dkt. 215-6. Zenith asserts that it received "express authorization" from MKE to register the Trademark. Dkt. 215-5, ¶ 3. In her Declaration, Hanri Kaya claims that "Sule Sarikaya Gocken, while operating in her capacity as an employee for MKE, expressly authorized [her] to register the Trademark so that MKE's name, brand, and image would be protected from competitors." Dkt. 225-1, ¶ 2. MKE denies this, asserting that Zenith "applied for registration of the MKE Logo without the authorization, approval or knowledge of MKE." Dkt. 217 at 8, ¶ 27; Dkt. 5-1 at 93-97 ¶ 19. Hanri Kaya claims that she informed MKE, through Sule Sarikaya, that she had registered the MKE logo, and thereafter, from 2015 through 2018, MKE employees attended numerous trade shows with Zenith and complimented Zenith's advertising of MKE products. Dkt. 225-1.

MKE terminated the parties' business relationship effective October 19, 2019, writing in a termination letter dated September 19, 2019:

> You have been informed in our letter dated August 28, 2019 . . . regarding the termination of the Purchase Agreement, dated February 12, 2019, as ZQC [Zenith Quest Corporation] did not fulfill its obligation.

> Within this scope, the exclusive representation agreement between Zenith and MKE[] which was signed on December 7, 2017, will be expired, 30 days later (on October 19, 2019) according to Article 8.1 of the related agreement.

Dkt. 217-13. Subsequently, MKE advised Zenith by letter dated June 29, 2020, that because the agency agreement was terminated on October 19, 2019, and Zenith is "not legally representative

of [MKE]", Zenith should not use the logo and name of MKE on "its website or other written and visual media." Dkt. 217-17. However, MKE claims that Zenith continued to use the MKE mark, including in tradeshow advertisements and on their website. Dkt. 217 at 9-10; Dkt. 217-16, 217-20.

The 2013, 2017, and 2019 Agreements appointed Zenith as MKE's exclusive agent for the marketing and sale of MKE products in the United States.[7] However, MKE claims that advertisements and a user manual for Zenith firearms which contain non-MKE parts were wrongfully advertising as "made by MKE," without identifying the non-MKE parts as manufactured by another entity. Dkt. 226 at 18. MKE claims this caused a likelihood of consumer confusion regarding the firearms. See Expert Report of Roy Huntington, Dkt. 215-17; Dkt. 5-1 at 93-97 ¶ 29. Zenith denies that it continued to "make media relating to MKE products" or represent that it was still in a business relationship with MKE on its website; however, Zenith admits that it did use MKE's name to "advertise and sell their leftover inventory of MKE products" and that their website contained links to .pdfs of "old product manuals, some of which included MKE firearms." Dkt. 225-1. Zenith abandoned the Trademark at issue on April 20, 2022. Dkt. 225-1.

## II.    Legal Standard

Summary judgment is appropriate if the pleadings and evidence show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[7] MKE writes that Zenith was "only authorized [by the contracts] to promote MKE's products on MKE's behalf." Dkt. 226 at 18.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted); see also United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### III. Choice of Law

The contracts between MKE and Zenith contain a choice of law provision that Turkish law applies. Federal Rule of Civil Procedure 44.1 requires that a party intending to raise an issue about foreign law give notice in a pleading or other writing, and that the court can consider any relevant material or source, including testimony, in determining foreign law. The party raising the foreign law issue has the burden to provide that law.  See e.g. Hengle v. Treppa, 19 F.4th 324, 340 n. 5 (4th Cir. 2021), cert. dismissed sub nom. Asner v. Hengle, 142 S. Ct. 2093 (2022), and cert. dismissed, 142 S. Ct. 2093 (2022) ("Pursuant to the governing-law clause of the loan agreement, tribal law controls interpretation of the agreement. However, the parties have not provided the Court with any tribal law concerning contract interpretation. Therefore, we will apply the contract interpretation principles of the forum, Virginia.") (citation omitted); see also Baker v. Booz Allen Hamilton, Inc., 358 F. App'x 476, 481 (4th Cir. 2009) (noting that Rule 44.1 "empowers a federal court to determine foreign law on its own but does not oblige it do so" and declining to address whether foreign law was adequately proven) (citation omitted).

MKE offers Dr. Büyüksagis as an expert to provide an analysis of the merits of Zenith's damages claim, specifically "whether under Turkish law [Zenith] would be entitled to seek compensation of consequential losses allegedly caused by . . . quality issues." Dkt. 250 at 1. Dr.

Büyüksagis indicates that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), supplemented by the Turkish Commercial Code as necessary, applies to Zenith's damages claim, and bars it.[8] However, beyond submitting Dr. Büyüksagis' expert report on the outcome of Zenith's damage claim under the CISG, MKE does not discuss the CISG in its motion for summary judgment. For example, both parties state that, as the 2013 Agreement was primarily for the sale of goods, that the applicable statute of limitations under the Virginia Uniform Commercial Code is four years. Dkt. 215-1 at 23, Dkt. 217 at 33. Further, Dr. Büyüksagis's expert report does not provide the court with applicable law, either Turkish law or the CISG, for all the relevant claims in this case, but only "ZQC's claim related to recovery for damages of an alleged breach of contract." [9] Dkt. 250 at 13.

I apply Virginia law to the contract claims in this case at the motion for summary judgment stage, primarily because both parties have relied on Virginia law and the Virginia Commercial Code throughout in this case including in their motions to dismiss and in their respective motions for summary judgment. This court has applied Virginia law when interpreting the contracts at the motion to dismiss.[10] Dkt. 240, n. 12. Additionally, the evidence of foreign law submitted by plaintiff, consisting entirely of Dr. Büyüksagis's expert report, is not sufficient to allow me to decide summary judgment based on the CISG or Turkish law. The report focuses

---

[8] Dr. Büyüksagis also states that "when faced with ambiguities or gaps in the CISG" the Turkish Commercial Code should be used to interpret the CISG. Dkt. 250 at 11.

[9] In applying Turkish law to interpret the CISG, Dr. Büyüksagis writes "Just as in other legal systems, Turkish contract law follows the concept that, in order for someone to be held liable for a loss resulting from a breach of contract, the damage must first be proved beyond a reasonable doubt." Dkt. 250 at 9. For example, under Virginia law, the standard of proof to recover for a breach of contract is "by a preponderance of the evidence." Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia, 715 F.3d 501, 517 (4th Cir. 2013) citing Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009)

[10] MKE also filed this lawsuit in federal court in Virginia, despite language in each of the three agreements stating that disputes arising from the agreements shall be settled by arbitration in the International Chamber of Commerce.

on how Turkish law impacts Zenith's damages claim for breach of contract, but as to other aspects of the contract claims MKE looks to Virginia law to guide the decision. Accordingly, I will apply Virginia law and the Virginia UCC, as that is the law argued by the parties in their motions.

### IV. Discussion

The parties have moved for summary judgment on multiple issues. MKE moves for summary judgment on its claims under the Lanham Act for unfair competition, trademark infringement, and cancellation of trademark registration, and moves for summary judgment on its common law unfair competition claim and for breach of the 2019 Agreement. MKE also moves for summary judgment on defendants' counterclaims for breach of the 2013, 2017, and 2019 Agreements, and unjust enrichment. In turn, Zenith moves for summary judgment on all MKE's claims, as well as all its own counterclaims I, II, and IV.

### A. Lanham Act Claims

MKE makes wide ranging claims in its Second Amended Complaint that Zenith wrongfully used MKE's trademark, improperly cancelled the mark or otherwise engaged in unfair competition. Count I asserts that Zenith wrongfully used the MKE trademark in its advertising and sale of its products, that these actions created a likelihood of confusion and that the unlawful and willful use of the MKE mark violated the Lanham Act, 15 U.S.C. § 1125(a). Count II asserts a Lanham Act violation contending that Zenith wrongfully used the MKE trademark to sell non-MKE products. Count III seeks cancellation of Zenith's registration of the MKE trademark registration because of a likelihood of confusion. Count IV seeks the same registration cancellation based upon fraud along with damages as may be awarded under the Lanham Act. Count V alleges a common law unfair competition claim based upon Zenith's use

of MKE's name and mark. Finally, Count VI is merely a remedy count not asserting any legal cause of action by asking for an injunction against Zenith's use of the MKE trademark.

(1) Unfair Competition and Trademark Infringement (Counts I and II)[11]

These counts allege unauthorized use of the MKE trademark by Zenith which deceived customers, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[12] Specifically, MKE alleges that Zenith improperly used the MKE trademark to sell Zenith's non-MKE military products. See Dkt. 123 ¶¶ 139–50, 151–61. MKE is only seeking summary judgment on its claims as to Zenith's infringement and unfair competition as a holdover licensee, i.e. after the 2019 termination of the business relationship. Dkt. 217 at 16, 226 at 12. On the other hand, Zenith is seeking summary judgment on all MKE's trademark claims.

To prove an unfair competition or trademark infringement claim under the Lanham Act MKE must show: (1) that it has a valid mark; (2) that Zenith used the mark "in commerce" and without MKE's authorization; (3) that Zenith used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that Zenith's use of the mark is likely to confuse consumers. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012); see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922 (4th Cir. 1995) (noting that test for trademark infringement and unfair

_____

[11] MKE moves for summary judgment on its claim that Zenith improperly used the MKE mark to sell non-MKE products after the business relationship was terminated, as a holdover licensee. Dkt. 226 at 12. However, MKE also claims that Zenith, during the parties' business relationship, "sold firearms under the MKE Marks that contained non-MKE parts." Dkt. 226 at 18. Zenith moves for summary judgment on this claim, which MKE opposes.

[12] Trademark infringement under the Lanham Act for an unregistered mark is brought under 15 U.S.C. § 1125(a), while a registered mark would be under 15 U.S.C. § 1114. "Section 43(a) 'prohibits a broader range of practices than does § 32,' which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992) (citations omitted)

competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address likelihood of confusion as to source of goods and services involved). See also, KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 118-20 (2004) (as to the burden of proof). Because the test for unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law, I will not separately analyze the state law claim (Count V).

A holdover licensee exists "where a licensor grants a license to a licensee to use a mark and then the licensor revokes the license (or it otherwise terminates), and the prior licensee continues to use the mark;" thus, the "prior licensee infringes the licensor's mark." Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc., No. 6:20-CV-54, 2022 WL 426592, at *5 (W.D. Va. Feb. 11, 2022). Some courts have held that a holdover licensee's continued, unauthorized use of an original trademark after the license to use the trademark has been terminated is sufficient to establish a likelihood of confusion. Leisure Sys., Inc. v. Roundup, LLC, No. 1:11-CV-384, 2012 WL 5378302, at *23 (S.D. Ohio Oct. 31, 2012); R/C Theatres Management Corp. v. Metro Movies, LLC, 44 F. Supp. 3d 626, 635 (D. Md. 2014) (citations omitted) (granting summary judgment on trademark infringement against a movie theater that continued to use the trademark of plaintiff management company after the license ended and noting that "several courts have held that when a party continues using a trademark after the license authorizing such use has expired, that factual scenario *alone* 'satisfies the likelihood of confusion test and constitutes trademark infringement'"). MKE does not allege that it officially granted a license to Zenith, but MKE instead points to the contracts which made Zenith authorized distributors and allowed use of the MKE mark to sell MKE products, until the relationship was terminated in 2019.

Zenith argues that MKE never registered a trademark or used its mark in the U.S., and foreign use does not create rights to a trademark in the United States. Dkt. 215-1, at 13. However, the MKE mark was being used in commerce during the parties' relationship, as Zenith agrees it used the mark, with permission, to promote MKE products, and Zenith registered the mark in 2016, albeit in its own name. US Gates Int'l, LLC v. Light Star Travel Agency, Inc., No. 1:10CV32 JCC/JFA, 2010 WL 4643022, at *5 (E.D. Va. Nov. 8, 2010) ("Section 1115(a) states, inter alia, that the registration of a mark on the Principal Register constitutes prima facie evidence of "the validity of the registered mark"). MKE also alleges, through the Declaration of Muhsin Dere, the Deputy Minister of Defense of Turkey, and Chairman of the Board of MKE, that between 1986 and 2012, MKE exported more than $16.5 million dollars of military products to the United States, and from 2009 to 2012, more than $7.7 million dollars of military products.[13] Dkt. 226-1. I find that MKE has a valid mark. Likewise, there is no dispute that MKE is the owner of the mark, and that Zenith used the MKE mark in commerce.[14] See e.g. Tactica International, Inc. v. Atlantic Horizon International, Inc., 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) ("As a general rule, when a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark.") The remaining elements in dispute are whether Zenith was authorized to use the MKE mark, and whether the use was likely to cause customer confusion.

    (a)  Disputes of fact exist as to whether Zenith used the MKE mark outside of its authorization during the relevant timeframe.

MKE authorized Zenith to use its mark to sell MKE products during the pendency

---

[13] As discussed in a separate Order, I denied Zenith's motion to strike this Declaration.

[14] Hanri Kaya acknowledges this in her Declaration when she states that MKE, through Sule Sarikaya Gocken, "expressly authorized [her] to register the Trademark so that MKE's name, brand, and image would be protected from competitors." Dkt. 225-1 ¶ 2.

of the business relationship. The parties dispute whether Zenith used the MKE mark to sell non-MKE products both prior to and after the termination of the relationship in October 2019.[15] In support of its claims, MKE cites to a news article from the <u>Crozet Gazette</u> dated September 4, 2020, where Hanri Kayi is quoted stating that while Zenith is currently "completely sold out of their imported firearms inventory" from MKE, they have 4,000 units on backorder.[16] Dkt. 217-18. MKE also points to an online advertisement by Zenith of an MKE firearm in October 2020, as well as three user manuals bearing the MKE symbol on the final page. Dkt. 217-19, 217-20, 217-21, 217-22. Zenith admits that it did use MKE's name to "advertise and sell their leftover inventory of MKE products" and that their website contained links to .pdfs of "old product manuals, some of which included MKE firearms." Dkt. 225-1. However, Zenith denies using the MKE trademark to sell non-MKE products.

Disputes of fact remain, specifically regarding whether Zenith used the MKE mark to sell non-MKE products. Of course, Zenith would generally be permitted to use the MKE mark to sell MKE's products. This circuit has held that nominative fair use applies to situations "in which the defendant uses the plaintiff's trademark to identify the plaintiff's own goods." <u>Rosetta Stone Ltd.</u>, 676 F.3d at 154 (discussing as an example an auto repair shop that advertises it repairs

---

[15] However, whether Zenith used the MKE mark to sell non-MKE products after the termination of the parties' contract relationship in October 2019 is the subject of MKE's motion for summary judgment.

[16] Zenith was apparently able to obtain additional inventory after this statement, as the parties entered into a stipulation in January 2021, resolving the motion for a preliminary injunction and permitting Zenith to sell its remaining MKE products:

> Defendants agree to limit their usage of the MKE Mark strictly to the sale of remaining MKE products in Defendants' inventory that necessarily bear the MKE Mark, including those remaining products that are returned to Defendants and offered for resale. MKE agrees not to seek profits or damages from the sale of the Remaining Products, but MKE reserves all other rights pertaining thereto.

Dkt. 43 ¶ 3. The stipulation expressly provides that it doesn't waive any rights or defenses in the litigation.

foreign cars by displaying those cars' trademarks); see also J. Thomas McCarthy, Trademarks and Unfair Competition § 4:17, "Fair use" of a trademark, (5th ed. 2023) (providing a hypothetical example of "nominative fair use" as an independent retailers stating "We sell genuine GLUGMORE plumbing parts"). Here, the October 2020 advertisement states that Zenith is offering for sale a "Zenith Z-5-RS SB Classic" which is "Made in Turkey by MKE." Similarly, the user manuals are for the Z-5 Series Rifle and Pistol, the Z-43 Series Rifle and Pistol, and the Z-41 Series Rifle, all of which are MKE firearms, and with the user manuals all stating that the firearms "have been manufactured by MKE Corporation for the U.S. market." Dkt. 217-19, 217-20, 217-21, 217-22.

(b) Disputes of Fact Exist as to Customer Confusion

MKE asserts that Zenith was a holdover licensee, which necessarily causes actual confusion, and that their expert, Roy Huntington, shows evidence of a likelihood of consumer confusion. Zenith does not directly address the issue of whether it was a holdover licensee in its response; instead, Zenith asserts that because it was the exclusive distributor for MKE in the U.S. "no other company in the U.S. could sell MKE weapons, eliminating the possibility of customer confusion." Dkt. 215-1 at 16. This point may miss the target, as MKE argues that the alleged customer confusion was whether the weapons were made by MKE or Zenith.

In determining the likelihood of confusion, the Fourth Circuit applies a multi-factor test evaluating: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their business; (5) the similarity of advertising used by the two parties; (6) the defendant's intent; (7) actual confusion (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. See La Michoacana Nat., LLC v. Maestre, No. 3:17-cv-

00727-RJC-DCK, 2018 WL 2465478, at *2 (W.D.N.C. June 1, 2018) (citing Pizzeria Uno Corp.

v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984) (setting forth factors one through seven). Not all

the factors will be equally important, or even relevant, in every case. See Rosetta Stone, 676 F.3d

at 153-54. Applicable here, the "analysis of every factor is unnecessary in cases such as this,

where the alleged infringement involves the continued use of a trademark after a license

expired." R/C Theatres Management Corp. v. Metro Movies, LLC, 44 F. Supp. 3d at 635 n.13.

See also Midas Int'l Corp. v. Poulah Invs., LLC, No. GJH-15-2240, 2016 WL 4532033, at *4 (D.

Md. Aug. 29, 2016) (noting the "factual scenario presented by this case "is unlike many other

direct infringement cases because there are not two competing trademarks, only [Poulah's]

continued use of [Midas'] trademark.").

MKE claims that Zenith used the MKE mark in a manner likely to confuse consumers

when, after the business relationship was terminated, it sold non-MKE products, i.e. Zenith's

products, using the MKE mark. MKE emphasizes that Zenith does "not dispute they continued to

use the MKE Mark after MKE terminated its relationship with Zenith by using the MKE Name

and Logo to sell inventory"; however, Zenith admits only to using the MKE mark to sell MKE

inventory, not using it to sell non-MKE inventory. Dkt. 225 at 3. I find that a material issue of

fact exists whether Zenith used the MKE mark to sell non-MKE products and whether this

alleged use created actual confusion or a likelihood of confusion.[17]

(2) Cancellation of Trademark Registration Due to Likelihood of Confusion (Count III)
and Cancellation of Trademark Registration Due to Fraud and Damages (Count IV).

---

[17] I also note that the parties dispute the damages calculation; however, that can be resolved at the expert
stage or trial. Further, damages for trademark infringement under the Lanham Act may include (1) the defendants'
profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). "The court
shall assess such profits and damages or cause the same to be assessed under its direction" and ensure that any relief
awarded "shall constitute compensation and not a penalty." Id. Also, courts have rejected arguments that a party
must prove actual damages to withstand summary judgment. R/C Theatres Mgmt. Corp., 44 F. Supp. 3d at 636 ("As
a final argument, Metro claims that R/C must prove money damages, and because it cannot the court should grant
Metro's motion for partial summary judgment. Metro is once again mistaken.").

MKE concedes that its claims for cancellation of the registration by Zenith of its mark are moot because Zenith has terminated the mark. (Dkt. 226 at 20). MKE still seeks damages for the fraudulent registration (Count IV). Defendants maintain that the entire claim is moot, and that "MKE no longer possesses the requisite standing to bring its Cancellation Claims" because Zenith has abandoned the Trademark. Dkt. 215-1 at 19–20.

As part of the registration application process, a trademark registrant must affirm, under oath, that he "believes" himself to be the owner of the mark sought to be registered and that "to the best of his knowledge and belief" no other person has the right to use the mark in commerce. 15 U.S.C. § 1051(a)(3)(A), (A)(3)(D). A mark shall be canceled if its registration was fraudulently obtained which requires a showing by clear and convincing evidence that defendants "'knowingly ma[de] false, material representations of fact' and intended to deceive the Patent and Trademark Office." 15 U.S.C. §§ 1064(3) and 1120.  See also Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp., 148 F.3d 417 (4th Cir.1998) (quoting Metro Traffic Control, Inc. v. Shadow Network Inc., 104 F.3d 336, 340 (Fed.Cir.1997)); see Brittingham v. Jenkins, 914 F.2d 447, 453–54 (4th Cir.1990) ("A number of courts have held that procurement of a trademark registration through the use of false or misleading statements does not constitute fraud within the meaning of 15 U.S.C. § 1115(b)(1) unless the statements were both material to the decision to grant the registration and made with a deliberate intent to defraud.").

MKE argues that Zenith falsely stated in its trademark application that "Zenith Firearms, Inc." was the owner of the MKE Logo, and to the best of their knowledge no one else "had the right to use the mark in commerce." Dkt. 217-14. However, fact issues remain which preclude summary judgment on this issue, including whether Hanri Kaya intended to deceive the Patent or Trade Office when she submitted the trademark application. U.S. Registration of a trademark can

be granted to an exclusive importer or distributor, for a foreign manufacturer, under specific circumstances, including if there is written consent from the owner of the mark to registration in the applicant's name. See J. Thomas McCarthy, Trademarks and Unfair Competition § 29:8 "Ownership in United States of the trademark of foreign-made goods" (5th ed. 2023). Zenith maintains its intent in registering the trademark was to "to protect MKE's name, brand, and image in the U.S. from competitors." Dkt. 225 at 14. Relatedly, the parties dispute whether MKE, through its employee Sule Sarikaya Gocken, directed and authorized Zenith to apply for registration of the MKE logo. See Resorts of Pinehurst, Inc., 148 F.3d at 420 (4th Cir. 1998) quoting 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 31:76, p. 31–116 to 117 (4th ed.1998) (noting that the "oath is phrased in terms of a subjective *belief,* such that it is difficult . . . to prove . . . fraud so long as the affiant or declarant has an honestly held, good faith belief"). Accordingly, Count III will be dismissed as moot because Zenith has cancelled the registration of the MKE mark. As to Count IV, the parties' competing motions for summary judgment will be denied.

      (3) False Advertising (Count XVI)

      Zenith moves for summary judgment on MKE's false advertising claim (Count XVI), which alleges that Zenith advertised MKE products in false and misleading ways in violation of the Lanham Act, including deceiving or having the capacity to deceive consumers into believing that Zenith were the "designers, makers, and/or manufacturers of MKE firearms." Dkt. 123 ¶ 245–46.

      A false advertising claim under the Lanham Act requires proof that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it

is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002).

MKE's false advertising claim rests upon its contention that during the parties' contractual relationship from 2013 to 2019, Zenith advertised MKE manufactured firearms in a way that misled customers into believing that Zenith was the manufacturer, instead of MKE. In support, MKE points to two advertisements it claims show Zenith "advertised MKE firearms under the 'Zenith' name . . . without identifying that the advertised firearms were made by MKE." Dkt. 226-7, Dkt. 226-8. The first advertisement, a list of five firearms, does not reference MKE. Dkt. 226-7. However, the second group of advertisements, including the same five firearms as well as additional firearms (the Z-5P Pistol, Z-5 Rifle, Z-5K Pistol, Z-5RS "Reverse Stretch" Pistol, Z-41 Rifle, Z-43 Rifle, Z-43 Pistol, and BORA-12) all state that "Zenith Firearms are manufactured by skilled workers in the modern factories of the 500 year old Turkish company, MKE." Dkt. 226-8. MKE also points to its expert report, which concludes that Zenith's advertising confused customers. Dkt. 215-17.

Hanri Kaya states in her declaration that MKE knew and approved of how it was using the MKE mark to advertise MKE products on the Zenith website and at trade shows. Dkt. 215-5. Denying that Zenith improperly modified MKE firearms, Zenith admits that it modified MKE firearms only on customer request, which "is not only legal, but was also expressly known and approved by MKE." Dkt. 215-1 at 29. MKE counters that Zenith was not authorized to sell

"[f]irearms containing non-MKE parts [which] were advertised as "made by MKE."[18] Dkt. 226 at 18. I will deny Zenith's motion for summary judgment on this claim because of disputes of fact, including the modifications to the firearms, the content of the advertisements, and the effect of these advertisements on consumers.

(4) Injunctive Relief (Count VI)

In its claim for injunctive relief, MKE alleges that Zenith "improperly filed a U.S. Trademark application" for the MKE mark in September 2016, and continues to use the MKE mark and name without permission. Am. Comp. ¶ 191-92. Zenith argues this claim is moot because "the parties resolved [it] when they filed a stipulation with the court" allowing defendants to use the MKE Trademark to sell the remaining MKE products in its inventory. Dkt. 215-1 at 20. The court order entered on January 12, 2021, Dkt. 43, resolves MKE's motion for a preliminary injunction by stipulation of the parties; however, MKE maintains this claim is not moot, as it has suffered irreparable injury, and MKE meets the elements to obtain a permanent injunction under 15 USC § 1116(a).

MKE is correct that if Zenith is found liable for trademark infringement, a permanent injunction may be appropriate to ensure that future violations do not occur. 15 U.S.C. § 1116(a); See also Lone Star Steakhouse & Saloon, Inc., 43 F.3d at 939 (finding that, when a defendant is found liable for trademark infringement, "an injunction is the preferred remedy to insure that future violations will not occur") (citation omitted). However, an injunction is a remedy, not a claim. Fare Deals Ltd. v. World Choice Travel.Com, Inc., 180 F. Supp. 2d 678, 682 (D. Md. 2001). "A request for injunctive relief does not constitute an independent cause of action; rather,

---

[18] MKE also points out that Zenith's motion for summary judgment does not address MKE's claim that Zenith is falsely advertising its new firearm (which competes with MKE firearms sold in the U.S.) as made in the U.S., despite evidence showing it contains foreign parts. Dkt. 226 at 26.

the injunction is merely the remedy sought for the legal wrongs alleged in the [] substantive

counts." Id.; See also Bell v. WestRock CP, LLC, No. 3:17-CV-829, 2018 WL 3493077, at *1

(E.D. Va. July 20, 2018) (dismissing improperly pled injunctive relief as a separate cause of

action because "injunctive relief is a remedy, not a cause of action"). Indeed, in the Second

Amended Complaint, MKE asks for a permanent injunction as a remedy. Dkt. 123. Thus, I will

dismiss Count VI for injunctive relief, as it is a remedy, not an independent cause of action.

### B. Breach of Contract Claims

(1) 2019 Agreement (Count VII & Counterclaim I)

The 2019 Agreement related to Zenith's payment of its outstanding debt to MKE, final

satisfaction of the Ohntrup judgment, and the sale of MKE firearms to Zenith. MKE argues that

Zenith breached the 2019 Agreement by failing to pay its debt in accordance with the Payment

Plan, which required payment in 13 installments beginning no later than February 28, 2019. The

core disagreement under the 2019 Agreement centers around why MKE did not ship the firearms

contemplated in the agreement. For its part, MKE contends that Zenith breached the conditions

precedent under the contract, including making neither the required installment payments nor the

40% down payment three months in advance of each scheduled firearm shipment required under

the 2019 Agreement.[19] Zenith counters that MKE materially breached the 2019 Agreement first,

by not completing its firearm orders correctly, shipping defective weapons, and misapplying a

payment toward its debt to MKE rather than to purchased firearms. Zenith excuses its failure to

---

[19] Paragraph 4.2.13 of the 2019 Agreement states:

ZQC confirms to perform the payment by wire transfer through a first class Turkish Bank (HalkBank) with 40% down payment 3 months in advance of each scheduled shipment, and the remaining 60% payment shall be completed in 3 days after the receipt of shipment note and the confirmation of ZQC's freight forwarder's receipt of the goods.

Dkt. 217-10.

make the installment payments arguing that MKE breached the 2019 Agreement first. The parties dispute whether the firearms MKE provided fell below any required quality standards, what those quality standards might be, and whether Zenith accepted the firearms and failed to timely notify MKE of any defects.

Essentially, both MKE and Zenith argue that the other party materially breached the 2019 Agreement first. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract. If the initial breach is material, the other party to the contract is excused from performing his contractual obligations." Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997). Further, "the party who commits the first material breach of a contract is not entitled to sue to enforce its terms." See W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP, Case No. 6:17-cv-00018, 2021 WL 4782274, at *5 (W.D. Va. Oct. 13, 2021) (applying Virginia law).

The 2019 Agreement specifically provides that MKE may not terminate the contract for late payment until the accrued late payment penalty exceeds six percent of the monthly installment payment. Zenith was required to "complete the note payment of each installment within the first ten days of related [sic] the month according to the enclosed 'Payment Plan' and shall inform MKE[]." Dkt. 217-10, ¶ 4.2.6. Zenith incurred "a penalty" of .2 percent per day over the monthly installment amount if the payments were not made within this 10-day period. Dkt. 217-10, ¶ 4.2.7. And further, if the total penalty amount accrued exceeds 6% of the monthly installment amount, only then "ZQC will be regarded as not to have fulfilled its obligation" and MKE can terminate the Agreement. Id. By contrast, the 2019 Agreement allows adjustments to the Payment Plan if MKE delays a firearm shipment. Paragraph 4.2.12 of the 2019 Agreement provides:

> In case of any delayed shipment of goods not caused by ZQC, as agreed in the delivery schedule, the delayed period will be reflected to the Payment Plan and the Payment Plan will be adjusted accordingly without any additional interest. However, if the delay occurs because of the shipment arrangements, there won't be any change in the payment agreement obligations.

Dkt. 217-10, ¶ 4.2.12. MKE alleges that Zenith made "only three of the thirteen obligated installment payments" and that Zenith admitted in its Amended Answer that it remained current on its payment obligations only through June 2019.   Dkt. 217 at 12, 13. Paragraph 43 (of page 33)[20] of the Amended Answer states:

> Through June of 2019, ZQC, ZQI, and ZF had complied with the debt-repayment schedule stated in the 2019 Contract. Nevertheless, after MKE repudiated the 2019 Contract, it made clear that it was going to apply the May 28, 2019 down-payment to the remaining debt.

MKE also relies on a letter dated October 14, 2019, from Mr. Kaya to MKE, which states that "currently ZQC has a past debt of approximately $3.350 million to MKE[]." Dkt. 217-23 ¶ 5. This letter appears to explore entering into yet another contract with MKE. For its part, Zenith counters that MKE breached the 2019 Agreement first by failing to ship firearms as contemplated by the Shipment Schedule in Attachment 2 of the 2019 Agreement.

Material issues of fact prevent summary judgment for either side, including whether either party materially breached the 2019 Agreement, and if so, that the breach excused performance, whether the penalties exceeded 6% of the monthly installment amount, whether MKE delayed shipments of its firearms and/or should have adjusted the Payment Plan, and whether the firearms shipped by MKE failed to meet any applicable quality standards and/or were rejected or accepted by Zenith. To the extent MKE argues that, as soon as Zenith missed an installment payment, MKE had cause to terminate the Agreement, this is simply not reflected in

---

[20] The Amended Answer has more than one paragraph 43.

the plain language of the Agreement.[21] Because of these genuinely disputed facts, which I cannot

determine on summary judgment, these competing motions for summary judgment will be

denied, including whether the actions of either party equaled a material breach of the contract,

and whether a material breach by one party excused the other's performance. See Agra, Gill &

Duffus, Inc. v. Benson, 920 F.2d 1173, 1176 (4th Cir. 1990) ("Whether a breach is material is a

question of fact."). Accordingly, the parties' competing motions for summary judgment

regarding breach of the 2019 Agreement will be denied.

(2) 2017 Agreement (Count XII and Counterclaim Count II)

(a) Zenith's Counterclaim regarding the 2017 Agreement (Counterclaim Count II)

Both sides move for summary judgment on Counterclaim Count II which alleges that

MKE breached its obligations under the 2017 Agreement to "ship properly manufactured

firearms consistent with the schedule stated in the 2017 Contract." Dkt. 209 at 36 ¶ 59.

Specifically, Zenith alleges that "in August 2018, ZF [Zenith Firearms, Inc.] made a payment for

250 firearms" but MKE refused to make the delivery and applied the payment to the remaining

ZQI debt. Id. at ¶ 61. Zenith claims it would have sold the MKE firearms and "been able to make

---

[21] In its memorandum in support of summary judgment, MKE omits these details regarding a penalty for late payments and does not specify whether the total penalty amount exceeded 6% of the monthly installment amount. MKE simply writes:

Section 4.2.7 "ZQC shall pay . . . if it does not pay the debt described in this Article within 10 days after the monthly payments specified in the payment table . . . ZQC will be regarding as not to have fulfilled its obligation and MKEK can apply Article 8 of this Agreement and take necessary legal actions."

Dkt. 217 at 12. In fact, Section 4.2.7 provides in full:

Section 4.2.7 "ZQC shall pay a penalty of two per thousand (.2%) per day over the monthly installment amount, if it does not pay the debt described in this Article within 10 days after the monthly payments specified in the attached payment table. The total penalty amount to be accrued in this way cannot exceed 6% of the monthly installment amount. In this case, ZQC will be regarded as not to have fulfilled its obligation and MKE[] can apply Article 8 of this Agreement and take necessary legal actions.

the later scheduled payments." Dkt. 225 at 15. MKE counters that, in making the 2019

Agreement, which expressly applied the August 7, 2018 payment of $197,262 to Zenith's

outstanding debt, Zenith waived any claims regarding that payment. See Dkt. 217–10, at 10.

I agree that Zenith's claims regarding the August 2018 payment, and related alleged

breach of the 2017 Agreement, are barred by the existence of the 2019 Agreement. Under

Virginia law, "novation is defined as a mutual agreement among all parties concerned for

discharge of a valid existing obligation by the substitution of a new valid obligation on the part

of the debtor or another." Honeywell, Inc. v. Elliott, 189 S.E.2d 331, 334 (Va. 1972); See also

Smith v. Snyder, 82 Va. 614, 618 (1886) (holding that "where a valid, binding change is made in

a contract, the old one is done away with, and a new one is substituted for it").  Novations should

not be presumed, instead "'to effect a novation there must be a clear and definite intention on the

part of all concerned that such is the purpose of the agreement." ' J.M. Turner & Co. v. Delaney,

176 S.E.2d 422, 425 (Va. 1970) (quoting Arlington Towers Land Corp. v. McFarland, 124

S.E.2d 212, 215 (Va. 1962)). The essential elements of a novation must be "determined from all

the facts and circumstances incident to the new agreement." Dillenberg v. Thott, 229 S.E.2d 866,

868 (Va. 1976) (citing Mitchell v. Cox, 52 S.E.2d 105, 109 (Va. 1949)). As applied here, Zenith

may not claim a breach of the 2017 Agreement related to the August 2018 payment, when the

2019 Agreement specifically included the August 2018 payment in its terms. The parties agreed

to the terms of a new contract in 2019 and Zenith agreed to roll over the debt from the 2017

Agreement and pay it off by selling the additional shipments of weapons. Zenith specifically

agreed to the Payment Plan, in Attachment 3 of the 2019 Agreement, which applied the August

7, 2018 payment to reduce the outstanding debt.

Accordingly, I will grant MKE's motion for summary judgment, and dismiss Zenith's counterclaim regarding the 2017 Agreement.[22]

> **(b) Zenith's Motion for Summary Judgment on MKE's Breach of Contract Claim for the 2017 Agreement (Count XII)**

Zenith moves for summary judgment on MKE's breach of contract claim for the 2017 Agreement (Count XII), which alleges that Zenith "breached Sections 4.2 and 4.3 [which required them to establish, maintain, and enlarge MKE's business in the U.S.] by, among other things, falsely advertising MKE-manufactured, MKE-branded products as products designed and manufactured by [Zenith]." Second Am. Compl. ¶¶ 223-224, 231–32. This claim is similar to the trademark claims, with MKE alleging that Zenith used the MKE mark to sell its products. Zenith counters that they did increase MKE's U.S. business, growing MKE's business from $0 to $52,744,624 in a span of 6 years." Dkt. 215-1 at 26. While Zenith asserts that it believed MKE did not do business in the United States when entering into the 2013 Agreement, because of the Ohntrup Judgment, MKE has alleged that it had business in the U.S. prior to 2013, and in fact, did millions of dollars in U.S. weapons business, even after the Ohntrup judgment. See Dkt. 226-1. Mr. Dere's declaration, filed January 27, 2023, is not the first time in this lawsuit that MKE alleged it has done business in the U.S. prior to 2013; in its Complaint filed on November 24,

---

[22] MKE also argues that the 2017 Agreement "never required" it to ship the 250 firearms defendants paid for in August 2018, including because from "August 2018 onward, the minimum order size" provided for in the new shipping schedule agreed to in April 2018 was 2500 firearms, and any order also required an advanced payment of 20%. Ex. AA, Dkt. 217-27. The document MKE points to in support, Ex. AA, includes a Planned Delivery Schedule, which indicates for August and September 2018, 3,000 firearms, and for October 2018, 2,600 firearms, and for November and December 2018, 2,500 firearms. Dkt. 217-27 at 3. However, while it may be accurate to say that the fewest firearms order listed in the Planned Delivery Schedule after August 2018 was 2,500 firearms, nowhere does the document state 2,500 firearms is the "minimum order size" for an order to be filled. Indeed, in May and June 2018, the schedule provides for only 500 firearms in the Planned Delivery Schedule. Further, the attached letter specifically provides that the enclosed delivery schedule is subject to change and is not "an obligation" or a "firm undertaking." Dkt. 217-27 at 2.

2020, MKE alleges its "products have been advertised and promoted and otherwise used in commerce throughout the United States, including this District, since 1974." Dkt. 1 ¶17.

In any event, for similar reasons as explained in the denial of the trademark claims and false advertising claim, including that disputes of fact remain regarding whether Zenith used the MKE mark to sell non-MKE products, summary judgment on this claim is denied.

### (3) 2013 Agreement

The 2013 Agreement was entered into by the parties on October 10, 2013, and had a three-year term, which expired on October 10, 2016. Dkt. 217-12. MKE filed the Complaint on November 24, 2020, but did not allege breach of the 2013 Agreement.[23] Dkt. 1. MKE first asserted a claim under the 2013 agreement in the Second Amended Complaint, filed on May 31, 2022. Dkt. 123, ¶ ¶ 220–224. Zenith filed its counterclaim alleging that MKE breached the 2013 Agreement on June 29, 2022. Dkt. 132. Zenith was later given leave to file an Amended Answer to the Second Amended Complaint, including asserting a statute of limitations defense, on December 20, 2022, but with identical counterclaims. Comp. Dkt. 132, 209.

### (a) Applicable Statute of Limitations

A federal court sitting in diversity will follow the law regarding the statute of limitations from the forum state. Coe v. Thermasol, Ltd., 785 F.2d 511, 514 n.5 (4th Cir. 1986). The Second Amended Complaint alleges both federal question jurisdiction (for the Lanham Act claims), as well as diversity jurisdiction. Dkt. 123. ¶¶ 18–19. A four-year statute of limitations applies to a

---

[23] The Complaint alleges that "MKE began exporting military products to Defendants in or around 2013 and Defendants in turn distributed and sold MKE-manufactured military products in the United States." Compl. ¶ 37. The Complaint alleges a breach of contract related to the 2019 Agreement only.

The Complaint alleges that "upon information and belief, in or around 2016, Defendants began using the MKE Mark on their website and other written and visual media, without MKE's permission, in order to advertise and sell their military products in the United States and ultimately profit off of a purported association with MKE." Compl. ¶ 38, Dkt. 1.

breach of any contract for the sale of goods.[24] The UCC, as adopted in Virginia, provides as follows:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.

Va.Code. Ann. § 8.2–725. A plaintiff's original action, however, tolls the limitation period for a counterclaim arising out of the same transaction or occurrence as the plaintiff's claim. Va. Code § 8.01-233.

The filing of the initial complaint did not toll the statute of limitations for Zenith's counterclaims. "The actual date a defendant files a counterclaim generally is the operative date for determining whether the defendant has met the time requirements of the applicable statute of limitations." Unlimited Screw Prod., Inc. v. Malm, 781 F. Supp. 1121, 1128 (E.D. Va. 1991) citing Va. Code §§ 8.01–228, 8.01–233(A).[25] But, the filing of the original action tolls the limitation period for a counterclaim arising from the same transaction or occurrence as the Plaintiff's claim. See Va. Code § 8.01-233(B). MKE did not assert any claims under the 2013 Agreement until May 31, 2022. By then, any claims under that agreement – whether in favor of

---

[24] The parties agree the at the 2013 Agreement was primarily for the sale of goods (ammunition) and that the applicable statute of limitations, pursuant to the Virginia Uniform Commercial Code is four years. Dkt. 215-1 at 23, Dkt. 217 at 33.

[25] Va. Code § 8.01-233 provides:

A.  A defendant who pleads a counterclaim or cross-claim shall be deemed to have brought an action at the time he files such pleading.

B.   If the subject matter of the counterclaim or cross-claim arises out of the same transaction or occurrence upon which the plaintiff's claim is based, the statute of limitations with respect to such pleading shall be tolled by the commencement of the plaintiff's action.

MKE or Zenith – were barred by the statute of limitations. The original Complaint did not bring any claims related to Zenith's allegations of breach of the 2013 Agreement due to a failure to indemnify it for loss due to the drop in the price of ammunition, or the actions of Mustafa Tanriverdi. It was not until the Second Amended Complaint, filed on May 31, 2022, that MKE alleged a breach of the 2013 Agreement at all, and these allegations are likewise barred by the applicable four-year statute of limitations.  Thus, the filing of the original complaint did not toll the limitation period for Zenith to file its counterclaim.

(1)  MKE's Motion for Summary Judgment on Zenith's Counterclaim
regarding the 2013 Agreement (Counterclaim Count III)

The 2013 Agreement required MKE to "indemnify and hold harmless [Zenith] against any losses . . . arising out of either parties' activities relating to the services or subject matter of this contract." Dkt. 132 ¶ 67–69. Zenith alleges in Counterclaim Count III that when retail prices for ammunition in the US market dropped in 2014, it could not keep up with its payments to MKE, but MKE refused to hold defendants harmless against the losses/damages they incurred. Zenith also contends that MKE violated its duty of good faith and fair dealing under the 2013 Agreement when, in April 2016, its employee "Mustafa Tanriverdi committed acts of espionage, exploited state secrets, and attempted to bribe defendant Kaya." Dkt. 132 ¶ 70.

Zenith's counterclaim regarding the 2013 Agreement was filed on June 29, 2022, and is barred by the four-year statute of limitations applicable to contracts for the sale of goods. As the 2013 Agreement expired on October 10, 2016, the latest possible opportunity to assert a timely claim for breach of the Agreement was October 10, 2020. As Zenith did not file its counterclaim

until June 29, 2022, it is barred by the statute of limitations, which expired at least two years prior.[26]

### (2) Zenith's Motion for Summary Judgment on MKE's Breach of Contract Claim for the 2013 Agreement (Count X)

MKE first asserted a claim under the 2013 Agreement in its Second Amended Complaint - more than four years after the contract ended. MKE attempts avoid the statute of limitations by claiming that the Second Amended Complaint relates back to the original complaint filed on November 20, 2020. [27]

Federal Rule of Civil Procedure 15(c)(1)(B) provides, in part, that an amendment to a pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that rose out of the conduct, transaction, or occurrence set out –or attempted to be set out – in the original pleading. Tucker v. United States, No. 2:11CR079, 2014 WL 3507453, at *10 (E.D. Va. July 14, 2014). The phrase "conduct, transaction, or occurrence" found in Rule 15 narrows "the interpretation of those terms to encompass only those events that share a 'common core of operative facts' and that "when parties seek to invoke the relation back doctrine, the newly added claims must 'arise from the same core facts as the timely filed claims,' and the facts cannot differ in 'time and type.'" Id. quoting Mayle v. Felix, 545 U.S. 644, 659 (2005).

---

[26] In fact, as the cause of action accrues when the breach occurs, the limitations period likely expired even prior to the end of the Agreement, i.e. when MKE allegedly refused to indemnify Zenith against the ammunition price drop in 2014, and when Mustafa Tanriverdi committed alleged "acts of espionage" and bribery in April 2016.

[27] Of course, even the Complaint, filed on November 24, 2020, exceeds the four-year statute of limitations for a UCC contract that expired on October 10, 2016. However, MKE asserts that the Judicial Emergency Orders of the Virginia Supreme Court tolled the running of Virginia statute of limitations. Dkt. 226 at 21. The Supreme Court of Virginia provided for a tolling period from March 16, 2020 through July 19, 2020 (126 days), such that this period shall not be counted for the purposes of determining statutes of limitations. See Eng. v. Quinn, 880 S.E.2d 35, 38 (Va. App. 2022) (discussing the Supreme Court of Virginia's Orders regarding tolling the statute of limitations during the period of judicial emergency due to Covid 19).

In the original Complaint, MKE alleges that "in or around 2016, Defendants began using the MKE Mark on their website and other written and visual media, without MKE's permission, in order to advertise and sell their military products in the United States and ultimately profit off of a purported association with MKE." Compl. at ¶ 38. MKE never mentions the 2013 Agreement and never asserts that any action by Zenith violates the 2013 Agreement. The allegations are not sufficient to conclude that the breach of contract claim for the 2013 Agreement in the Second Amended Complaint arose from the same conduct, transaction, or occurrence or the same core of operational facts alleged in the original complaint sufficient to relate back to the Complaint.[28] There were no allegations of breach of contract for the 2013 Agreement, which is not mentioned at all. Accordingly, I find this claim is barred by the statute of limitations.

Accordingly, all claims under the 2013 Agreement are barred by the statute of limitations, and I find that no equitable tolling applies.[29]

### C. Unjust Enrichment Claims

Both sides bring claims for unjust enrichment, which relate to the subject matter of the various express contracts – the 2013, 2017, and 2019 Agreements, and thus are barred. MKE's

---

[28] Of course, even the Complaint, filed on November 24, 2020, exceeds the four-year statute of limitations for a UCC contract that expired on October 10, 2016. However, MKE asserts that the Judicial Emergency Orders of the Virginia Supreme Court tolled the running of Virginia statute of limitations. Dkt. 226 at 21.  The Supreme Court of Virginia provided for a tolling period from March 16, 2020 through July 19, 2020 (126 days), such that this period shall not be counted for the purposes of determining statutes of limitations. See Eng. v. Quinn, 880 S.E.2d 35, 38 (Va. App. 2022) (discussing the Supreme Court of Virginia's Orders regarding tolling the statute of limitations during the period of judicial emergency due to Covid 19).

[29] I note that the court's previous opinion on the motions to dismiss also found that "all relevant dates are more than four years" from the date when the counterclaim was filed. Dkt. 240. However, after referencing the parties' dispute over whether the Turkish 10 year statute of limitations would apply, or Virginia's 4 year statute of limitations, and noting that the "facts establishing the defense are not facially apparent" the court found that it could not dismiss the 2013 contract claim based on a statute of limitations defense. Of course, I have now determined that Virginia law, including the four statute of limitations in the Virginia UCC will apply.

unjust enrichment claims in Counts VIII and XV[30] are based on the same subject matter as the breach of contract claims. Zenith's Counterclaim Count IV for unjust enrichment is also based on the same subject matter of the 2019 Agreement, that it satisfied the Ohntrup Judgment.

In Virginia, an implied contract action such as unjust enrichment is not available when an express contract governs the dispute's subject matter. See CGI Fed. Inc. v. FCi Fed., Inc., 814 S.E.2d 183, 190 (Va. 2018). A party may plead alternative or inconsistent claims under Fed.R.Civ.P. 8, but once a valid express contract is proven, the implied contract actions will fail. See CDC-LCGH, LLC v. Mayor, 313 F. App'x 637, 641-42 (4th Cir. 2009) (holding that contract claims and quasi-contract claims could be plead in the alternative, but, on a motion for summary judgment, the unjust enrichment claim failed because of the proven existence of a valid, governing contract). Here, both parties bring claims under the 2013, 2017, and 2019 Agreements, and neither side argues that the contracts are not valid. In fact, both sides plead affirmatively that each agreement is a valid and enforceable agreement. Otherwise, the breach of contract claims would fail. Va. Elec. & Power Co. v. Broe Growth Capital LLC, 2007 WL 2071726 at *2 (E.D. Va. 2007) citing Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir. 1988) ("[I]f a court finds that an express contract exists between the parties, either by determination of the court or stipulation of the parties, the equitable remedy of unjust enrichment is unavailable."). Further, a party cannot use unjust enrichment to revive a time-barred breach of contract claim. See e.g. Gentry Tech. of S.C., Inc. v. Baptist Health S. Fla., Inc., No. 1:14-CV-02127-JMC, 2016 WL 403879, at *3 (D.S.C. Feb. 3, 2016).

    (1) Unjust Enrichment Claims Pertaining to the 2019 Agreement (Count VIII and Counterclaim IV)

---

[30] As noted, Count XIV is absent from the Second Amended Complaint.

Because the 2019 Agreement is a valid, binding agreement, the unjust enrichment claims relating to the same subject matter as that agreement must be dismissed, specifically MKE's Count VIII and Zenith's Counterclaim Count IV. The claim asserted in Count VIII by MKE is based on the same subject matter alleged in the claim for breach of contract of the 2019 Agreement, Zenith's failure to pay for the military products received, and asks for damages in the same amount. Likewise, in Counterclaim Count IV Zenith alleges that MKE wrongfully revoked Zenith's status as its exclusive distributor in 2019 after the Ohntrup Judgment was settled, and thus received the benefit of that settlement without conferring the benefit on Zenith of being MKE's exclusive U.S. distributor following the settlement. The 2019 Agreement provides the following regarding the Ohntrup Judgment:

> ZQC shall submit a statement of undertaking (Attachment-5) that the remaining obligation of $645,000 from the Ohntrup case will be paid and the case will be closed by June 1, 2019. This attachment will be an integral part of this Agreement.

2019 Agreement, ¶ 4.2, Dkt. 217-10.[31] Attachment 5, dated February 12, 2019, and signed by Hanri Kaya as CEO of Zenith Quest Corporation states, "Zenith Quest International, Inc. undertakes to complete its remaining obligation of $645,000 to complete the Ohntrup case and

---

[31] MKE points to a Waiver Agreement (Dkt. 217-3) and signed on October 23, 2013 by Kutlay Kaya, on behalf of Zenith and himself, and by MKE, which provides, in part, as follows:

> [MKE] will designate [Zenith] owned by [Kutlay Kaya] as the exclusive agent for sales to be made in the United States of America.

> The Representation Agreement between the parties will be valid until the payments in the purchase agreement are completed (provided that they do not violate the provisions of the agency agreement). As of this date, the agency agreement shall remain in force provided that there is no conflict between the parties and there is no change in legislation as well as parties agreeing for the agreement to remain in force.

Dkt. 217-3.

close the settlement by June 1, 2019." Dkt. 123-3.[32] Thus, Count VIII and Counterclaim Count IV for unjust enrichment will be dismissed.

(2) <u>Unjust Enrichment Claims Pertaining to the 2013 and 2017 Agreement (Count XV)</u>

MKE alleges unjust enrichment claims in Count XV based on the same subject matter alleged in its claims for breach of contract. MKE alleges that "as a result of mutual agreement" MKE delivered military products to Zenith and appointed Zenith as MKE's exclusive United States distributor, in exchange for which Zenith would sell MKE's products "in a matter that would establish, maintain, and enlarge MKE's business in the United States" Dkt. 123 ¶¶ 239–40. However, Zenith was unjustly enriched when MKE "wrongly and false advertised MKE-branded products as designed and manufactured by [Zenith] to establish, maintain, and enlarge [Zenith's] business." <u>Id.</u> at 241. These allegations are nearly identical to the subject matter of the allegations in MKE's breach of contract claims for the 2013 and 2017 Agreements. Furthermore, the unjust enrichment claim related to the 2013 Agreement is barred by the three-year statute of limitations. <u>See</u> <u>Harmon v. Harmon</u>, No. 120CV1442RDATCB, 2022 WL 610174, at *8 (E.D. Va. Mar. 1, 2022); <u>East West, LLC v. Rahman</u>, 873 F. Supp. 2d 721, 730 (E.D. Va. 2012) (noting that the "three-year limitations period applicable to oral contracts applies to all unjust enrichment claims"); <u>RMS Tech., Inc. v. TDY Indus., Inc.</u>, 64 F. App'x 853, 855 (4th Cir. 2003) (applying a four-year statute of limitations to a contract for the sale of goods governed by the UCC, but applying "Virginia's three year statute of limitations for unwritten contracts" to the equitable counts in the complaint).

---

[32] While attachment 5 is missing from dkt. 217-10, it is included as an attachment to the Second Amended Complaint.

Accordingly, because of the existence of the express contracts in this case, the unjust enrichment claims covering the same subject matter are precluded, and the parties' motions for summary judgment are granted as to these claims.

### D. Remaining Claims in Second Amended Complaint

Zenith moves for summary judgment on all the remaining claims in MKE's Second Amended Complaint, account stated (Count IX), defamation (Count XVI), defamation per se (Count XVII), and breach of the covenant of good faith and fair dealing for the 2013 Agreement (Count XI) and 2017 Agreement (Count XIII), both plead in the alternative to the breach of contract claims.

(1) Account stated (Count IX)

"An account stated is where the accounts between the parties have been . . . settled." Ellison v. Weintrob, 123 S.E. 512, 514 (Va. 1924). "[T]he mere rendering of an account by one party to another, is not sufficient to make an account stated" instead, there must be "evidence to show that the party who is sought to be charged has, by his language or conduct, admitted the correctness of the account." Robertson v. Wright, 58 Va. (17 Gratt.) 534, 541 (1867). MKE alleges that it issued invoices to Zenith, that Zenith failed to pay, and that by agreeing to the 2019 Agreement, which included installment payments regarding that debt, Zenith "impliedly assented" and thus, an "account stated" exists.[33] Zenith moves for summary judgement on this count, denying they owe an account to MKE and arguing that "[a]ny prior outstanding debts between [them] were negotiated and integrated into the 2019 Agreement."  Dkt. 215-1 at 22.

---

[33] The Second Amended Complaint alleges that under the 2019 Agreement, the parties "agreed that [Zenith] owed over $5,000,000 for the delivery of the military products and restructured . . . the outstanding debt . . . ." Dkt. 123 ¶ 216. Zenith "promised to pay MKE what they owed over the course of thirteen installment payments" and thus have "impliedly assented" to the account's accuracy by failing to timely object to the installment payments under the 2019 Agreement "in a reasonable amount of time." Dkt. 123 ¶ ¶ 217–18.

Zenith is correct that the 2019 Agreement is a new contract that incorporates its prior outstanding debt, using an installment plan, and not an account stated.

An account stated contemplates a settled "statement of the account" between the parties, often in the form of invoices "accepted without complaint." CMA CGM S.A. v. Dubitec Am., Inc., No. 2:14CV608, 2015 WL 5837571, at *5 (E.D. Va. Oct. 2, 2015) (citing Goldsmith v. Latz, 32 S.E. 483, 485 (Va. 1899)) ("When one party received from the other 'a statement of the account between them, showing the exact amount of compensation for his services . . .  and accepted the same without complaint or objection, . . . such conduct . . . raises a strong presumption that he had agreed to the correctness of such settlement."). Instead, here, we have a new contract, with multiple moving pieces, including as just one component, installment payments related to a previous debt. While the 2019 Agreement does indicate that the Zenith "shall pay the amount stated in enclosed payment plan, together with the interest rate, in payments as 13 (thirteen) installments" (Dkt. 217-10, ¶ 4.2.3) it also links those payments to MKE's shipment of goods, including providing for delayed payment if shipment of weapons is delayed, and discussing the possibility of Zenith requesting to "renegotiate the payment plan." (Id. at ¶¶ 4.2.11, 4.2.12, 4.2.14, 4.2.16). Thus, Zenith entering into the 2019 Agreement is distinct from Zenith receiving a statement of account and accepting it without objection.

Accordingly, Zenith's motion for summary judgment on the account stated claim is granted, as the 2019 Agreement and the failure to pay the listed installments does not create an account stated.

(2) Defamation (Count XVI) and Defamation per se (Count XVII)

MKE's defamation counts allege Zenith published a Press Release on November 24,

36

2020 making false statements about MKE and the parties' relationship that harmed MKE's reputation, including defamatory per se statements that MKE was involved in illegal activity, which hurt MKE's ability to conduct business. Zenith argues that the statements in the Press Release were not defamatory, both because they were "substantially true," and did not carry the "requisite sting" needed to harm MKE. Zenith also argues that MKE is required to show actual malice to prevail on a defamation claim, which it has not done.

MKE's defamation claims arise from a single press release, posted on Zenith's blog on November 24, 2020. Dkt. 123-6. The press release states that Mr. Tanriverdi, "MKE's factory manager" attempted to bribe "Zenith's owner, Kutlay Kaya" and that "when MKE's management failed to deal with the problem, Mr. Kaya took the case to the authorities which led to the arrest and imprisonment of Mr. Tanriverdi for treason." Dkt. 123-6. The press release further indicates that Zenith suspected MKE of "intentional sabotage" of its firearms and that MKE illegally diverted a payment. Id.

To prove a defamation claim under Virginia law, MKE must show (1) publication; (2) of an actionable statement; and with (3) the requisite intent. Brown v. Triton Sec., No. 1:04-CV-01544-JCC, 2005 WL 4663731, at *2 (E.D. Va. Mar. 23, 2005). The Constitution requires that when a public figure brings an action for libel, the public figure must prove that "the statement was made with 'actual malice,' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times v. Sullivan, 376 U.S. 254, 280 (1964)); CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 293 (4th Cir. 2008) (noting that the "'application of the state law of defamation' is limited, of course, by the First Amendment to the Constitution of the United States") quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 14, (1990). To be "actionable", a plaintiff must prove that the statement is both defamatory and false.

Ebersole v. Kline-Perry, 292 F.R.D. 316, 321 (E.D. Va. 2013) (noting that truth "acts an absolute

defense to any defamation") (citing Goddard v. Protective Life Corp., 82 F.Supp.2d 545, 560

(E.D. Va. 2000)). "Defamatory words are those 'tend[ing] so to harm the reputation of another as

to lower him in the estimation of the community or to deter third persons from associating or

dealing with him." Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (citing Restatement

(Second) of Torts § 559). To rise to the level of the required harm to an individual's reputation,

i.e. the defamatory "sting", the Supreme Court of Virginia has stated that defamatory language:

> tends to injure one's reputation in the common estimation of mankind, to throw
> contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule,
> or contempt, or which is calculated to render him infamous, odious, or ridiculous.

Schaecher, 772 S.E.2d at 594 (quoting Moss v. Harwood, 46 S.E. 385 (Va. 1904). Certain false

statements are per se defamatory, including a false statement that imputes "the commission of

some criminal offense involving moral turpitude for which the party, if the charge is true, may be

indicted and punished."[34] Shupe v. Rose's Stores, Inc., 192 S.E.2d 766, 767 (Va.1972).

(a)  MKE is a Government Entity

MKE argues it is a "private figure plaintiff" that "may recover for negligently made

defamatory statements" and counsel for MKE likewise stated during oral argument in June 2023

that MKE is a private corporation. Dkt. 226 at 33. However, in a separate lawsuit MKE filed in

this court on November 4, 2022, MKE admits that it is "a government entity controlled by the

Republic of Turkey's Department of Defense" and that MKE employees are government

---

[34] Other false statements that constitute defamation per se under Virginia law include those that "impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment [and t]hose which prejudice such person in his or her profession or trade." Shupe, 192 S.E.2d at 767.

employees.[35] Makine Ve Kimya Endustrisi A.S. v. Zenith Quest Corporation, et al, Case No. 3:22cv00066, Compl. ¶ 2, Dkt. 1. Zenith likewise argues that MKE is a government entity, and points to the December 6, 2022 deposition of MKE's corporate representative, Yasin Akdere, stating that "MKE is owned 100 percent by the government."  Dkt. 317 at 7.[36] On these facts, I find that MKE is a government entity.

Because MKE itself, the government entity, brings this defamation suit, and not an individual who works for MKE, i.e. a public official[37], it is probable that the United States Constitution bars these claims. As the Supreme Court noted in New York Times Co. v. Sullivan, "[f]or good reason, 'no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.'" 376 U.S. at 291  (citation omitted); see also Rosenblatt v. Baer, 383 U.S. 75 (1966) (referring to "the spectre of prosecutions for libel on government, which the Constitution does not tolerate in any form"); Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist., 442 F. App'x 681, 690 (3d Cir. 2011) (citing to New York Times and finding that "[e]ven if a charter school is not a political subdivision, if it constitutes *any* kind of governmental entity, then it cannot sue for libel"). However, as Zenith does not directly address this issue in its briefing,[38] I will grant

---

[35] In the Second Amended Complaint filed in this lawsuit, MKE alleges it was "converted by presidential decree from a Turkish public company to a Turkish private company" in July 2021.

[36] As permitted by the order at Dkt. 313, Zenith supplemented its motion for summary judgment with this document.

[37] A public official is one who has a governmental role and whose "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." Rosenblatt v. Baer, 383 U.S. 75, 86 (1966); Wells v. Liddy, 186 F.3d 505, 531 (4th Cir.1999) (Whether a plaintiff in a defamation suit is a public official or public figure is an issue of law to be resolved by the court).

[38] Zenith does cite to Dean v. Town of Elkton, for the proposition that "No matter how vitriolic and baseless is an attack on the government, it cannot give rise to a defamation action without doing irreparable violence

Zenith's motion for summary judgment on its argument that MKE has not shown the actual malice required to prevail. See Hatfill v. The New York Times Co., 532 F.3d 312, 317 (4th Cir. 2008) ("As an accommodation to the First Amendment's protections of free speech and press, the Supreme Court has held that "public officials" and "public figures" must prove, as part of a defamation case, that the defendant's allegedly defamatory statement was made with "actual malice").

Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth," meaning that that defendants must have "entertained serious doubts as to the truth of [their] publication." Harte–Hanks Commc'ns., Inc. v. Connaughton, 491 U.S. 657, 667, 109 (1989). Under the actual malice standard, which must be proved by clear and convincing evidence, MKE must show that Zenith had a "subjective awareness of probable falsity" of the publication. Hatfill, 532 F.3d at 317 (4th Cir. 2008) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 335 n. 6 (1974)).

To survive summary judgment, MKE must "forecast evidence sufficient to prove actual malice by clear and convincing evidence," i.e. that Zenith "made the [false] statement with knowledge that it was false or with reckless disregard of whether it was false or not." Carr v. Forbes, Inc., 259 F.3d 273, 282 (4th Cir. 2001) (citations omitted). Here, Zenith is entitled to summary judgment because there is no evidence establishing that Zenith knew the statements were false, or acted with reckless disregard of whether it was false or not.

Accordingly, Zenith's motion for summary judgment on MKE's defamation claims is granted and these claims are dismissed.

---

to political and philosophical debate." 54 Va. Cir. 518 (2001), aff'd sub nom. Dean v. Dearing, 561 S.E.2d 686 (Va. 2002).

(3) <u>The Covenant of Good Faith and Fair Dealing for the 2013 Agreement (Count XI)</u>

    <u>and the 2017 Agreement (Count XIII)</u>

Zenith moves for summary judgment on MKE's claims for breach of the covenant of good faith and fair dealing for the 2013 Agreement (Count XI) and 2017 Agreement (Count XIII). Count XI and Count XIII, both plead in the alternative to the breach of contract claims, assert that the 2013 and 2017 Agreements contained an "implied covenant of good faith and fair dealing" breached when Zenith "through their wrongful false advertising conduct, prevented MKE from receiving the benefits" they contracted for, including by "failing to 'establish, maintain, and enlarge,' MKE's business in the United States." Dkt. 123 ¶¶ 226–27, 235–36. Zenith argues that a breach of the covenant of good faith and fair dealing cannot be pleaded separately, as an alternative, to MKE's UCC claims. Dkt. 215-1 at 24.

I agree that MKE's separate "alternative" claims for breach of the implied covenant of good faith and fair dealing cannot exist apart from its breach of contract claims. <u>Charles E. Brauer Co., Inc. v. Nationsbank of Va., N.A.</u>, 466 S.E.2d 382, 385 (Va. 1996) (holding that while "a duty of good faith and fair dealing exists under the UCC as part of every commercial contract. . . the failure to act in good faith under § 8.1-203 does not amount to an independent tort [and] [t]he breach of the implied duty under the UCC gives rise only to a cause of action for breach of contract); <u>see also</u> <u>Liris S.A. v. Morris & Assocs., Inc.</u>, 496 F. Supp. 3d 931, 942–43 (E.D.N.C. 2020) ("while plaintiff pleads a separate enumerated claim for breach of implied covenant of good faith and fair dealing, this is not a claim that can exist independently of a breach of contract claim, whether for breach of express warranty, or breach of other contractual terms and conditions under the UCC"). Accordingly, Zenith's motion for summary judgment as to the separately enumerated claim for the implied covenant of good faith and fair dealing is

granted. See <u>Haynes v. JTH Tax, Inc.</u>, No. 2:17CV144, 2018 WL 11313812, at *4 (E.D. Va. Apr. 4, 2018) citing <u>Charles E. Brauer Co., Inc.</u>, 251 Va. at 33 ("Under Virginia law, there is no separate cause of action for a breach of the duty of good faith and fair dealing.")

**V. Conclusion**

The parties' competing motions for summary judgment are granted in part, and denied in part. Specifically, the parties' motions for summary judgment on the Lanham Act claims (Counts I, II, IV), and common law unfair competition under Virginia law (Count V), are denied, and Count III (cancellation of trademark registration due to likelihood of confusion) is dismissed as moot.

Zenith's motion for summary judgment on MKE'S claim for false advertising in violation of the Lanham Act (Count XVI) is denied. Zenith's motion for summary judgment on MKE's count for injunctive relief (Count VI) is granted to the extent that injunctive relief is properly a remedy, not a separately enumerated claim.

The parties' competing motions for summary judgment related to the 2019 Agreement are denied (Count VII and Counterclaim Count I). MKE's motion for summary judgment on Zenith's counterclaim related to the 2017 Agreement (Counterclaim Count II) is granted, and Zenith's motion for summary judgment on Counterclaim Count II is denied, and Zenith's motion for summary judgment on MKE's breach of contract claim for the 2017 Agreement (Count XII) is denied. The parties competing motions for summary judgment related to the 2013 Agreement are granted in part and denied in part and claims related to the 2013 Agreement (Count X, Counterclaim Count III) are dismissed.

The parties' competing motions for summary judgment on the unjust enrichment claims are granted in part and denied in part and claims for unjust enrichment are dismissed (Count VIII, Count XV, Counterclaim Count IV).

Zenith's motion for summary judgment on MKE's account stated claim (Count IX) is granted and this count is dismissed.

Zenith's motion for summary judgment on MKE's defamation claims are granted (Count XVI and Count XVII).

Zenith's motion for summary judgment on MKE's claims related to a covenant of good faith and fair dealing in the 2013 Agreement (Count XI) and 2017 Agreement (Count XIII) are granted.

A separate Order accompanies this Opinion.

Entered:  October 6, 2023

*Robert S. Ballou*

Robert S. Ballou
United States District Judge